STATE v. GRACE WYNNE, Appellant.—No. 38548.—182 S. W. (2d) 294.

Division Two, September 5, 1944.

*Joseph L. Judson* for appellant; *Julius C. Shapiro* and *Clyde Taylor* of counsel.

278

*Roy McKittrick,* Attorney General, and *Covell R. Hewitt,* Assistant Attorney General, for respondent.

BARRETT, C.—A jury has found that on September 13, 1934, Grace Wynne shot and killed Mary Thompson. She was tried, found guilty and sentenced to fifteen years imprisonment, December 29, 1941—January 2, 1942. From the facts and circumstances as detailed by the State's witnesses the jury reasonably found that in shooting and killing Mary Thompson she acted purposefully and with malice and was therefore guilty of murder in the second degree.

Briefly the background of the homicide is this: the defendant, Grace Wynne, and John "Jack" Thompson were married in 1913. She divorced him seven years later because of "other women." She left Kansas City and in January, 1920, within a month of her divorce, married Arthur Wynne. They had one child, Dorothy Lou. In the meanwhile Jack Thompson married Mary. At the time Grace and Thompson were divorced he was a deputy in the circuit clerk's office at a salary of about $125.00 a month. Subsequently he became an influential politician, a successful operator of slot machines and a man of considerable means. By 1925 he was a frequent and attentive visitor of Mrs. Wynne's in Oklahoma. In 1931 she moved to Kansas City and after divorcing Wynne lived in the Pickwick Hotel. Thompson paid all her bills, bought her an automobile and supplied

her with money. He paid daily visits to her room, kept some clothes there and frequently spent the night with her.

According to the State's evidence the facts of the killing were that after numerous homicidal threats Grace went to the Thompson home on September 13, 1934, shortly after eight o'clock and waited on the porch knowing that Jack was bringing Mary home from a vacation. As Jack unlocked the front door Grace stepped out from behind a post and shot Mary five times with a .25 caliber automatic pistol. One bullet riccocheted and struck Grace in the forehead.

Grace's version of the matter was that she went to the Thompson home by prearrangement with Jack for the purpose of settling their triangular affairs and particularly for the purpose of discussing the amount of money Mary was to have for a divorce. She says that as she stepped upon the porch she said, "John, I have come like you told me. How do you do, Mary" and Mary jumped in her face, scratched and kicked her, and they fell to the floor fighting. The next thing she knew she felt as if she had been hit in the head with a brick and became unconscious as she was crawling down the steps. She testified that she did not have a gun and that she did not shoot Mary.

The appellant admits that she has failed, in her motion for a new trial, to specify and assign as error the giving of Instruction C and the admission of expert evidence relating to firearms but she urges that the court has the power in its discretion to consider these matters and that the court should do so as they are plainly error and affect substantial rights prejudicially. Whether the court has the power urged we need not decide. Even if it has, the exigencies of this case are not such as to compel its exercise. The matters complained of were not assigned as error or called to the trial court's attention in the appellant's motion for a new trial and under the statute we are precluded from considering them. Mo., R. S. A., sec. 4125; State v. Bailey (Mo.), 169 S. W. (2d) 380; State v. Lazie (Mo.), 199 S. W. 122; State v. Sharp (Mo.), 300 S. W. 501.

So it is with her arguments that the court should have sustained her motion to quash the indictment and her plea to the jurisdiction in which it was alleged that the court did not have jurisdiction to try her because she had been previously adjudged insane by a probate court. The record merely recites that these motions came on for hearing and were overruled. On this state of the record there being nothing on the face of the record or the indictment (State v. Finley, 193 Mo. 232, 91 S. W. 942) showing invalidity or no jurisdiction there is nothing for us to review in this regard. The motion and the plea do not prove themselves and in the absence of the evidence produced, if any, in support of them, we cannot say the court erred. Motions and pleas of this nature are not different from motions or pleas based on the assertion that the defendant had not had a

 preliminary hearing [State v. Lettrell (Mo.), 39 S. W. (2d) 556] or that a juvenile court had jurisdiction [State v. Miller, 307 Mo. 365, 270 S. W. 291] or a plea of former jeopardy. State v. Rozell (Mo.), 279 S. W. 705; State v. Revard, 341 Mo. 170, 106 S. W. (2d) 906; 22 C. J. S., secs. 426, 434, pp. 660, 679.

 In addition to the formal charges, the court instructed the jury on the three degrees of murder, self-defense and insanity. The court defined "insanity" and instructed the jury that if they found that Grace Wynne was insane when she shot Mary Thompson they should acquit her. It is urged that it was error for the court to give the instruction because it was a mere abstraction and prejudiced the defendant in that it would cause the jury to assume that she admitted the act of killing and was contending by way of confession and avoidance that she was not legally responsible for her acts. It is insisted that there was no evidence whatever that she was insane or even claimed to be at the time of the shooting although she was adjudged insane on November 19, 1934 and committed to the asylum in St. Joseph and appealed from a judgment of restoration of sanity in 1940. It is not necessary to detail the circumstances which may have caused the court to give the instruction nor to pass on whether there was any evidence of insanity because it is not pointed out and we cannot see how the instruction prejudiced the appellant in the manner claimed. The instruction did not tell the jury that the killing was admitted or that insanity was a plea by way of confession and avoidance. As the appellant says the instruction merely gave an abstract definition of insanity and told the jury that if they found her to be insane they should acquit her. Even if there was no evidence of insanity we cannot see how the appellant was injured by the instruction any more than a defendant is not injured by an instruction on alibi or self-defense when there is no evidence of either. State v. Millsap, 310 Mo. 500, 276 S. W. 625; State v. Pohl, 170 Mo. 422, 70 S. W. 695; State v. Bunyard, 253 Mo. 347, 161 S. W. 756. Insanity instructions under similar circumstances have been held to be harmless error in Chriswell v. State, 171 Ark. 255, 283 S. W. 981 and Watson v. State, 46 Okla. Cr. 36, 287 P. 816. And it is our view in the absence of a certain demonstration of prejudice that the instruction in this case was harmless. 24 C. J. S., sec. 1922, p. 1019.

 The defendant's daughter, Dorothy Lou, testified for her mother. She was about twenty-one at the time of the trial. She stated that she became acquainted with Jack Thompson when he came to Oklahoma to call on her mother. She was then but a little girl. She called him "Daddy Jack." He brought her presents and was solicitous of her welfare. Jack met Dorothy Lou and her mother at the station when they came to Kansas City. She was then six. She went to the Pickwick Hotel almost daily and saw Jack there with her mother. She knew he was married to Mary. She knew that

Jack often spent the night with her mother. She thought they were happy together and their relationship pleasant. The last time she saw Jack she was fourteen. That was when Jack went to St. Joseph and took her mother from the institution there and drove them to Topeka. On that occasion he gave the mother $2500.00 and promised to meet them in Dallas or New Orleans.

In his closing argument one of the prosecuting attorneys said: "Gentlemen of the Jury: I am ashamed to say it in answer to Mr. Walsh, I am ashamed to remind you of it again, but Mr. Walsh tells you that among other accomplishments that this defendant raised a daughter. Think of the fashion in which she raised that daughter, gentlemen. Will that not give you an insight of the character of the defendant here? When she was fourteen years old and when John Thompson was married, having been married in 1925 to Mary Hammond, and prior to that time, gentlemen, this daughter remains in Oklahoma before Mrs. Wynne was divorced from Arthur Wynne and while John was married to Mary Hammond, both of them married, under these circumstances, gentlemen, she reared a daughter and had the audacity to confront you with the proposition 'Well, my daughter had good training.' Why, gentlemen of the jury, in the State of Missouri we call it adultery, and when you go across the State line it is a violation of the Mann Act. Are you going to believe what these witnesses tell you?"

It is urged that the argument was so prejudicially erroneous that the jury should have been discharged. It is said that the argument was uncalled for abuse. The statement with reference to the Mann Act may have been improper but as to that comment the court, on objection, said, "The defendant is on trial only for the offense prescribed in the instructions and I think the argument should be confined to that. Let the comment be stricken." The court refused to discharge the jury and we cannot say that the court abused its discretion. The remaining part of the argument cannot be classified with that low order of abuse or denunciation which would entitle the defendant to a new trial. State v. Barrington, 198 Mo. 23, 95 S. W. 235. A portion of the argument was obviously in reply to the defendant's high praise of the witness [State v. Londe, 345 Mo. 185, 132 S. W. (2d) 501] and much of the prosecutor's argument was a fair inference and comment on the facts as they appeared from his standpoint. State v. Wilkins (Mo.), 100 S. W. (2d) 889; State v. Cohen (Mo.), 100 S. W. (2d) 544; State v. Johnson, 351 Mo. 785, 174 S. W. (2d) 139.

 It is urged that the court erred in permitting the State to prove the defendant's flight from the insane asylum at St. Joseph on July 11, 1935. It is contended that on that date and until August 13, 1935, there was no criminal charge of any character pending against her and consequently none of her movements at that time

were for the purpose of avoiding arrest. This argument does not present the full picture and the evidence in its background was admissible. It is true that the first complaint filed against her in justice court had been dismissed and a second complaint was not filed in another justice court until August 13, 1935. It might be interpolated that she was not tried on the basis of any complaint filed in a justice court nor on an information but on a grand jury indictment returned on September 6, 1940. The night of the shooting one witness testified that the defendant said, "you don't have to hold me. I am not going to run away. It is all fixed. They won't do anything to me." On November 19, 1934, she was adjudged insane by the Probate Court of Jackson County on a complaint signed by her mother. She did not appear at the proceedings though she was in jail near the probate court and knew of the hearing. She or her mother were represented by lawyers chosen by Thompson. While she was in the asylum at St. Joseph she was visited weekly by her daughter, her mother, Thompson and frequently by his lawyers and friends. Many of the visits were for the purpose of persuading her that it was to her best interests to remain in the institution until things "cooled off" or until Jack "quieted things down." On July 11, 1935, she was given a leave of absence for the purpose of visiting her mother in a hotel in St. Joseph. She was met by Thompson and her daughter and driven to Topeka. From Topeka mother and daughter went to Pueblo, Trinidad, Santa Fe, Houston, San Antonio, Dallas and finally New Orleans where she operated a flower shop under the name of Grace Thompson. After several years detectives from Kansas City found her. Once she came back with the officers, once or twice she returned to Kansas City voluntarily. Once she resisted removal from the State of Louisiana in a proceeding in the Federal courts there. She said she told Jack, while she was in St. Joseph, that she had no right there and was anxious to get out of the place. There are many other circumstances in regard to her various movements and her incarceration in the institution at St. Joseph but these are sufficient to illustrate that though there was no charge pending on the day of her flight that she did, in fact, flee even though no charge was pending. From these circumstances though she may not have fled on that day to avoid arrest she may have fled to avoid a trial which she thought imminent though no proceeding was pending. State v. Duncan, 336 Mo. 600, 80 S. W. (2d) 147. From all the evidence it is a fair inference that she had feigned insanity or permitted an insanity proceeding to be instituted for the purpose of avoiding a trial, the filing of a complaint or an arrest. State v. Stevens, 242 Mo. 439, 147 S. W. 97. In any event in the circumstances of this case the evidence was not inadmissible merely because there was no complaint or criminal proceeding pending against her on the day of her original flight. Annotation, 25 A. L. R. 886.

■ The substantial merit of this appeal lies in the question of whether the appellant was unfairly and unjustly prejudiced by the prosecuting attorney's exhibition and demonstration with a pistol as he cross-examined her.

The night Mary Thompson was shot the appellant was asked what she had done with the gun. She said she had thrown it in the bushes. The police searched the shrubbery near the porch and found a .25 caliber automatic pistol. The pistol was marked and placed in the police department's property room. That pistol disappeared from ■ the property room and no one was able to find it and it was not produced at the trial nor was its disappearance accounted for.

As we have said the appellant testified that she did not have a gun and did not shoot Mary Thompson. Both the appellant and her daughter testified that Jack Thompson always carried a pistol. There was no direct testimony to the effect that Thompson had shot his wife or that he desired her death. But from the defendant's statement that Thompson was a "dirty double crosser" and had shot her (the appellant) it is a possible though most unlikely inference from that statement and the circumstances that he had shot his wife.

At any rate, on cross-examination the daughter, Dorothy Lou, said that her mother did not carry a gun and she never saw her with a gun. But she had often seen Jack Thompson carrying a gun. It was a small, black, flat gun, she thought. As to whether it had a trigger she said "To tell the truth, I don't know—had a trigger some place." She was asked: "Was it a gun about that long (indicating). Q. And "Where did John carry the gun? A. Back there (indicating). Q. In his hip pocket? A. Yes. Q. It made a large bulge, you couldn't help but see it? A. I didn't see it until he took his coat off. ·Q. When it would stick up over his pocket? A. Yes. Q. In this pocket with him (indicating)? A. Yes, it was there. Q. When he would take off his coat, you could see that gun sticking out of his pocket? A. Yes. Q. You could see it sticking out of his pocket? A. Yes. Q. It was a large gun then, wasn't it, Dorothy? A. It was small, looked like an ordinary gun to me. Q. Did he carry it in a scabbard or in his pocket? A. I think it was in some kind of a case or something. Q. That was inside his pocket, the case? A. Yes. Of course that was in the winter time. He had an overcoat too. Q. You wouldn't see the gun until he would take his coat off? A. Yes. Q. Then you would see it sticking out of his coat? A. Yes."

On direct examination the appellant stated that Jack Thompson owned and carried a revolver "all the time." On cross-examination the State's attorney said: "This gun you say John Thompson carried, what type of a gun was it? A. I couldn't say, just an ordinary gun I guess. Q. Did you ever see it sticking out of his pocket? A. Not much, it didn't stick out much. Q. How much of it did stick out?

A. Very little . . . Q. Would you say that much of the gun stuck out (demonstrating) ? A. I don't know.''

It does not precisely appear at what point in the cross-examination the State's attorney produced a pistol and began demonstrating with it. But, he continued: Q. ''Did it stick up that high (indicating) ? A. Not quite that much. Q. How about that (indicating) ? A. More like that. Q. More like that ? A. Yes. Q. More like that (indicating) ? A. Yes, sir, that is it.''

At this point in the cross-examination defense counsel objected to ''the display of firearms before the jury unless it be identified as the revolver claimed by the State to have been used by the defendant. It is highly inflammatory, and prejudicial, calculated to prejudice the jury against the defendant.''

Then, out of the jury's presence the court said that the gun in question was a .25 caliber pistol. It was agreed that the gun itself had no connection whatever with the defendant nor with the case. The court then said: ''Let the record show that the gun which the State has offered to use is an ordinary .25 caliber J. Caeser automatic pistol, and the court understands the State is exhibiting it at this time in the pocket of the State's attorney, Mr. Hill, only for the purpose of asking the defendant whether the amount that it will extend out of the hip pocket of the State's attorney is about the same as Mr. Thompson's extended from his pocket.'' Appellant's counsel then made further objection to the use of the gun and among other things said ''without any foundation, a fire arm for the subtle effect it will have upon the jury . . . and is of such a highly inflammatory and prejudicial character as to prejudice the defendant in the eyes of the jury and to make them conscious of the existence of a gun before them.''

Then, over defense counsel's objection and exception the court said to the jury: ''In passing upon the objection, the State will be permitted to exhibit the automatic pistol which Mr. Hill, the State's attorney, has in his pocket only for the purpose of asking the witness to determine to what extent the pistol of John Thompson extended from his pocket on occasions when she did see it. There is no contention by anyone that the pistol which Mr. Hill holds in his pocket had anything in the world to do with the occurrence in question, and it is conceded that the pistol is the personal property of Mr. Jack Gibbs, an investigator in the Prosecuting Attorney's office, and is completely and entirely unconnected with this case in any manner whatsoever.''

The State's attorney then proceeded with the cross-examination: ''Q. Mrs. Wynne, would you say the gun you saw in John Thompson's pocket was as large as that? (Indicating.) A. Well, to tell the truth, I never paid much attention. Q. You did see it sticking out of his pocket? A. Yes, sir, I did. Q. Do you see anything

sticking out of my pocket (indicating)? A. I didn't say the gun was that size. . . . Q. Do you know whether it was larger than this gun I have shown you (indicating)? A. I really don't know. I did not pay any attention to his gun. . . . Q. Would you say the gun was larger than this, the gun I have just shown you (indicating)? A. I couldn't say, Mr. Hill. I didn't pay no attention to it.''

Weapons or other objects which furnish evidence may be submitted to the senses of the jury. Such ''real'' or ''demonstrative'' evidence (''autoptic proference,'' Wigmore) is a direct physical illustration of a fact taking the place of an oral description by the witness. Thayer, Cases on Evidence, p. 713; 2 Wharton, Criminal Evidence, Sec. 755, p. 1274. But such ''real'' or ''demonstrative'' evidence must meet the tests of relevancy, materiality, probative value and reasons of policy in the administration of justice. 2 Wharton, Criminal Evidence, sec. 756. The rule and its underlying philosophy is summarized by Wigmore: ''Accordingly, it might be asserted, 'a priori,' that where the existence or the external quality or condition of a material object is in issue or is relevant to the issue, the inspection of the thing itself, produced before the tribunal, is always proper, provided no specific reason of policy or principle bears decidedly to the contrary. Such ought to be, and such apparently is, the principle accepted by the Courts.'' 4 Wigmore, Evidence, sec. 1151, pp. 240-241.

Thus weapons or objects connected with the defendant or the crime, when sufficiently identified, become relevant and possess probative value. 22 C. J. S., sec. 712. But note with what great pains the court demonstrates that the machine gun, the rifle and the pistol used in the Kansas City Union Massacre were identifiable with the defendant, his associates and the crime. State v. Richetti, 342 Mo. 1015, 119 S. W. (2d) 330. As a general rule weapons and objects not connected with the defendant or the crime are not admissible unless they possess some probative value. 22 C. J. S., sec. 712, p. 1210. Thus when any one of three could have shot the deceased their respective .44, .45 and .38 caliber pistols were properly admissible in evidence against the defendant because the deceased was killed by .38 caliber bullets and his was the .38 caliber gun. Harris v. State, 129 Fla. 733, 177 So. 187.

In this case, as the court told the jury, the .25 caliber gun in question had no connection whatever with the defendant or the crime. The stated purpose of its use was to demonstrate how far a pistol stuck out of John Thompson's pocket. And a demonstration or illustration with a gun might have some probative force for that purpose. But entirely aside from the relevancy and materiality of the fact, under the circumstances of this case, of how far a pistol stuck out of his pocket, there was not sufficient proof of similarity of circumstances to warrant the demonstration. 4 Wigmore, Evidence,

sec. 1154a; 2 Wharton, Criminal Evidence, sec. 757. No one testified that Jack Thompson carried a .25 caliber J. Caesar automatic pistol. The defendant insisted that she did not know the size of the gun he carried. As a matter of fact there was but little evidence of the type or size of gun he habitually carried. There was no evidence of the size of his hip pocket other than the jury's general personal knowledge of pockets. How far the gun stuck out of his pocket, if material and relevant, was a fact that the ██ witnesses could describe and illustrate without a gun about as clearly as it could be demonstrated with a gun especially with no more definite similarity of circumstances present. 2 Wharton, Criminal Evidence, sec. 755, p. 1275. At most how much a gun stuck out of Thompson's pocket when Dorothy or the defendant saw it in the Pickwick Hotel was a collateral, if not immaterial, matter. Tested by relevancy, materiality and similarity of circumstances the pistol was not properly admissible in evidence and the decisive question is whether its demonstration and exhibition prejudiced the defendant and deprived her of a fair trial or whether the error was harmless as the State contends.

We have been able to find but a single instance comparable in its circumstances to the present case and the problem it presents. In State v. Rusnak, 108 N. J. L. 84, 145 Atl. 754, after threats and a grudge of long standing the defendant shot a policeman. Within an hour and a half of the shooting the police searched his room and found a revolver, other than the one used in the homicide, hidden in a shoe. It was urged that it was error to receive that gun in evidence. The court was of the view that the jury could infer that the defendant had carried this revolver "in his quest for his victim, although he actually used another weapon" (which the police found) and for that reason the second revolver was admissible in evidence. However, the court was of the further opinion that even though the pistol was inadmissible the error was harmless; "but if its admission was technically erroneous, it was not and could not have been prejudicial to the defendant in maintaining his defense on the merits, *since other evidence demonstrated beyond a reasonable doubt that the defendant actually shot and killed the decedent.*" (Italics supplied.)

It may be that as we view it there is but little, if any, doubt that Grace Wynne shot and killed Mary Thompson and that in so doing she was certainly guilty of murder in the second degree as the jury has found and yet we cannot say the error was harmless. Aside from the reasons of relevancy, probative value and similarity of circumstances which would exclude this demonstrative evidence the reason "of policy or principle" which "bears directly to the contrary" is unfair prejudice to the accused. The objection to the introduction of weapons or other demonstrative evidence, especially when not connected with the defendant or his crime, on the ground of unfair prejudice is based on sound psychological and philosophical principles.

They are "First, there is a natural tendency to infer from the mere production of any material object, and without further evidence, the truth of all that is predicated of it. Secondly, the sight of deadly weapons or of cruel injuries tends to overwhelm reason and to associate the accused with the atrocity without sufficient evidence." 4 Wigmore, Evidence, sec. 1157, p. 254.

The presence of factors obviating these objections are not present in the instant case. "The objection in its first phase may be at least partly overcome by requiring the object to be properly authenticated, before or after production; and this requirement is constantly enforced by the Courts. The objection in its second phase cannot be entirely overcome, even by express instructions from the court; but it is to be doubted whether the necessity of thus demonstrating the method and results of the crime should give way to this possibility of undue prejudice." 4 Wigmore, Evidence, sec. 1157, p. 254.

Error in the admission of evidence "should not be declared harmless unless it is so without question." State v. Richards, 334 Mo. 485, 494, 67 S. W. (2d) 58, 61. The record does not demonstrate that the defendant was not injured by the error as by showing that the jury disregarded or could not have been influenced by the evidence. State v. Nasello, 325 Mo. 442, 30 S. W. (2d) 132; 24 C. J. S., Secs. 1915, 1915(7), pp. 954-958, 980-981. The object was a lethal weapon —coincidentally a .25 caliber automatic pistol. The inherent nature of the weapon was such, under the circumstances of this case, that the jury would undoubtedly have a tendency to infer from a demonstration with it "the truth of all that is predicated of it" when in fact it had nothing whatever to do with the defendant or the crime.

Because of this prejudicial error the appellant is entitled to a new trial and the cause is accordingly reversed and remanded. *Westhues, C.,* dissents; *Bohling, C.,* concurs.

PER CURIAM:—The foregoing opinion by BARRETT, C., is adopted as the opinion of the court. All the judges concur.