STATE of Missouri, Respondent,

v.

Robert REYES, Appellant.

No. WD 38593.

Missouri Court of Appeals,
Western District.

Sept. 22, 1987.

Rehearing Overruled and Transfer to
Supreme Court Denied Oct. 27, 1987.

Application to Transfer Denied
Dec. 15, 1987.

Robert Beaird, Kansas City, for appellant.

William L. Webster, Atty. Gen., Elizabeth A. Levin, Asst. Atty. Gen., Jefferson City, for respondent.

Before GAITAN, P.J., and MANFORD and NUGENT, JJ.

NUGENT, Judge.

Defendant Robert Reyes appeals his conviction by a jury of second degree murder for the shooting of David Wayne Carlson, claiming that the trial court erred in allowing into evidence a hunting knife that had no connection to the defendant or to the alleged crime. Finding that point dispositive of this appeal, we reverse the conviction and remand for a new trial.

At about two o'clock on the morning of January 26, 1986, David Wayne Carlson was killed by a single blast from a shotgun then in the hands of defendant Reyes, who was seated in the back seat of a car beside which Carlson was standing. The state charged both John Lockheart, the driver of the car, and defendant Reyes with Carlson's murder.

To prove the first degree murder charge filed against defendant Reyes, the prosecutor relied primarily upon the testimony of Liana Carlson, the deceased's widow, and Detective Rebecca Rishel, who had investigated the shooting.

Detective Rishel testified that the morning after the shooting defendant Reyes gave her a full written statement of the event. The statement was admitted into evidence and may be summarized as follows:

During the evening of January 25, John Lockheart drove defendant and Billy Lichner to the Birmingham area in Clay County to do some target shooting. After that they went to a 7–Eleven to get something to drink. There they met Carlson[1] and his four companions. Defendant Reyes did not know the members of that group, but John Lockheart did, and he stopped at their car and talked to them. When Lockheart returned to his own car, Carlson came over and said that he was going to kick him in the face. Carlson then challenged Lockheart and his companions to a fight at San Rafael Park. Lockheart agreed to go but then drove around for a few minutes trying to decide whether he should. He told defendant Reyes that Carlson had accused him of "snitching" to the police about Carlson's having stolen some typewriters. He decided to go to the park to tell Carlson that he did not "snitch."

At the park, defendant's statement went on to say, Carlson would not listen to Lockheart's denials and insisted that he get out of his car and fight or leave. Carlson said that if he did not get Lockheart then, he would "just get him later." He kept reaching into Lockheart's car window "smacking" him in the face with his open palm calling him and his companions names. Carlson took off his shirt and offered to fight them all. Then he said, "Well I see your buddy in the back seat has got a gun," adding that defendant did not have the guts to pull the trigger. At that time defendant's gun was in the back window of the car and Lockheart's shotgun was upright in the front seat.

Carlson then appeared to reach over and punch John in the head through the window. Lockheart reached to get his shotgun, and defendant cocked his gun hoping to scare Carlson off. Instead, Carlson leaned the upper portion of his body into the car and grabbed the barrel of both shotguns and appeared to try to jerk them out of the car. While he was doing so, defendant's gun went off. Defendant thought that the shot had missed Carlson because he did not say anything; instead he bent over and ran to his car. At that time John Lockheart drove out of the park and took defendant home.

1. Throughout this January 26 statement defendant referred to Carlson as the "white male", apparently because he did not then know Carlson's name.

Defendant Reyes said in his statement that after the target shooting he thought that his gun was unloaded. He had his finger on the trigger, and, when Carlson pulled the gun away, it pulled his finger against the trigger causing the gun to go off. He did not intentionally fire it.

On the way home, defendant checked the gun again because he could not believe that it had been loaded. When he did, the spent shell fell out. Lockheart checked the outside of the car and found a few drops of blood, but defendant thought that at most he had nicked Carlson. He did not believe that anyone who had been shot with a shotgun could just walk away.

A couple of hours after the shooting Detective Rishel took Liana Carlson's signed statement. She was one of the nine persons present and was standing ten feet away when the shot was fired. Ms. Rishel testified that Liana told her that John Lockheart had pointed a shotgun out the car window and that, as he did, Carlson "grabbed the gun and there was a shot."

Detective Rishel also took a number of other statements from witnesses. All of the witnesses that she and other detectives interviewed said that Carlson had grabbed the shotgun before it fired.

At trial, Liana Carlson testified that after work she, her husband, and their friends, Jeff Harris, Matt and Calista, drove in the Carlson's car to the 7–Eleven store where they saw John Lockheart and his companions. She heard no argument there, but Carlson and Lockheart, who had been friends for two years, talked and at Carlson's suggestion agreed to go to the park. Carlson's party went ahead, and when Lockheart drove in and parked about ten feet away, Carlson approached his car and began talking. All she could hear was Carlson telling Lockheart that "if he didn't want to fight to just leave." Liana testified that she guessed Lockheart was "spouting off" about having a gun because Carlson asked him if that was the only way he knew how to fight, to which Lockheart retorted, "No, that's the only way I know how to win." At that Carlson got mad and took off his shirt, but Lockheart pulled his

car forward and Liana heard a shotgun cock. Carlson and Lockheart continued to argue, Carlson telling Lockheart that if he did not "want to fight just to leave." Lockheart again moved his car forward and stopped, at which Carlson "got really mad" and reached in and slapped Lockheart on the shoulder with the palm of his hand.

At that time a gun barrel came four to six inches out of the window at an angle from the back seat. As it did, Carlson turned to his left and the gun went off when he was less than one foot away. He then staggered to the other side of his car and fell. Liana testified that she did not see her husband grab the gun nor did she see him reach into the back seat to grab the gun or grab it outside the window.

On cross-examination, Liana Carlson admitted that her signed statement given to Detective Rishel said, "John grabbed a shotgun and pointed the barrel of the gun out the car window on the drivers side. And as he did David [Carlson] grabbed the gun and there was a shot." She testified, however, that she did not remember anything she said in that statement. She conceded that her signed statement did not say that the shotgun pointed out of the back seat at an angle, but said that Lockheart grabbed the shotgun and that he was in the front seat. She also conceded that her signed statement said nothing about Carlson's slapping John Lockheart. She admitted that in neither her signed statement given that night nor in her answer to Detective Rishel's inquiry the next morning had she told the police about Matt and Calista being at the park. Finally, Liana admitted that her testimony that John Lockheart had said that using a shotgun was "the only way I know how to win" did not appear in her earlier statement.

The prosecutor did not call Matt, Calista or Jeff Harris, the Carlsons' companions at San Rafael Park. The only other prosecution witnesses whose testimony has significance on this appeal were officer Wayne Owens and the medical examiner, Dr. Paul C. Vescovo, Jr.

Responding to a police broadcast, a Claycomo police officer stopped Lockheart

alone in his car shortly before three o'clock, within an hour of the shooting. Later, police crime scene investigator Wayne Owens inspected Lockheart's car and found a hunting knife protruding from underneath the front seat. He took pictures of the car's interior, including two photographs showing the knife as he found it. Over defendant's objection, the court admitted the knife, the officer's testimony about it and the photographs, which were then passed to the jury. The state argued that evidence of the knife went to the question of intent, showing that Lockheart and his friends went to the park "heavily armed." The court overruled the objection. In his opening statement the prosecutor had referred to the knife, and later in his summation he reminded the jury that Lockheart's group, knowing that "there was gonna be a fight," went to the park "loaded for bear" with two shotguns and a knife. During the trial, the prosecutor also referred to the knife in cross-examining defense witnesses, apparently trying, without success, to get them to say that on the way to the park Lockheart had stopped at his house to get the knife.

Carlson died at the scene from blood loss resulting from the gunshot wound. According to the Clay County medical examiner, Dr. Paul Vescovo, Jr., the gunshot entered Carlson's body from the back of his right arm, then travelled through his armpit, angling slightly (five to ten degrees) forward into the chest cavity.

The defense witnesses gave the following accounts of what happened at San Rafael Park. Lockheart's front seat passenger, sixteen-year-old Billy Lichner, testified that Carlson was acting crazy, as though intoxicated. He began to punch the car door, so Lockheart put the car in gear and started rolling. Carlson reached in, grabbed the steering wheel and punched Lockheart in the face. Threatening to kill the car's occupants with the guns, Carlson grabbed the barrel of Lockheart's shotgun with his right hand. A struggle for the shotgun ensued, first between Carlson and Lockheart, then with Billy joining in to help Lockheart. Carlson then crossed his left arm over his right and grabbed the barrel of defendant Reyes' shotgun and tugged on it, and it went off. Carlson staggered, then walked back to his car. At first, Billy and the others thought that Lockheart's shotgun had fired, not the defendant's. Billy believed that defendant Reyes' gun was empty because Reyes had made a point of emptying his shotgun after target practice at the Birmingham caves. Moreover, Billy did not hear the defendant cock or chamber his shotgun during the altercation with Carlson. After the blast, Lockheart's group sped away. At the time, none of them believed that Carlson had been seriously wounded or even hit. At the defendant's house, they examined the car and, finding a small spot of blood, decided that Carlson had been hit but that the wound must have been superficial. At some point, defendant Reyes checked his shotgun and ejected an empty shell. Billy believed that the shell was stuck in the chamber, suggesting that defendant did not know the gun was loaded.

Margo Silvey, a pupil at Maple Park Middle School, joined the Lockheart group that evening when her mother drove her to the defendant's house. In the car she sat in the back seat on the driver's side. She testified about going with the group to the Birmingham caves to shoot defendant's gun. Then, she said, they went to the 7–Eleven so that "Billy could call his mother." When they left the 7–Eleven, they took Joey Catalino, a fifteen-year-old high school freshman who also was along, to his home in obedience to his parents' edict. During the confrontation at San Rafael Park she did not see Carlson reach into the car to hit John Lockheart. She heard the defendant cock the shotgun. She testified that he put the barrel of the gun out of the window about five inches, that Wayne Carlson began to pull on the barrel with both hands, and it went off.

Defendant Reyes, an eighteen-year-old high school junior, lives with his parents. He took the stand in his own behalf and testified that he was holding the shotgun between his legs while Carlson was smacking the side of John Lockheart's head and struggling for Lockheart's gun. He saw

that Carlson was not armed but heard Carlson call for a knife that was never produced. In an effort to scare Carlson off, he chambered his own shotgun, keeping his finger on the trigger. Instead of backing off, Carlson turned on Reyes, and within a split second reached toward the back seat and grabbed the barrel of defendant's gun, and the gun discharged. He did not feel the recoil because Carlson was pulling the barrel in the opposite direction.

At first, he was not sure that it was his gun that had fired because he had emptied the chamber after target practice and thought the gun was not loaded. On the way home, however, he checked to see and ejected a spent shell. He threw the shell in a ditch near his house. Like the others, defendant Reyes did not believe that Carlson could have sustained a direct hit and then walk away. He said that he did not intentionally kill David Carlson; he did not even know him.

An officer went to the defendant's house the next day, and the defendant surrendered his shotgun without protest. At trial, he identified his shotgun as the weapon involved in the shooting and the prosecutor placed the gun in evidence without objection.

## I.

In his second point, dispositive of this appeal, defendant claims that admission of evidence of the knife was prejudicial error because no evidence connected the knife with the defendant or with the shooting. The state argues that the knife was properly admitted as probative of intent, demonstrating that John Lockheart and his friends drove to the park "heavily armed" and "loaded for bear," "intending to fight Carlson with deadly weapons" and intending "to use deadly force" against Carlson.

■ The merit of the state's argument depends on the relevancy of evidence of the knife. Under Missouri law, "[a]rticles showing motive, or malice, or intent, or knowledge or preparation, may be received in evidence if shown to be connected with the crime or with the accused." *State v. Evans*, 237 S.W.2d 149, 151 (Mo.1951). De-

monstrative evidence is admissible "if it throws any relevant light upon a material matter at issue." *State v. Bolder*, 635 S.W.2d 673, 688 (Mo.1982) (en banc), *cert. denied*, 459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983). Weapons that tend to explain the manner in which a crime was committed and that are found at or near the scene of the crime are generally admissible. *State v. Neal*, 591 S.W.2d 178, 180 (Mo.App.1979). Such evidence is properly admitted when "it tends to connect the defendant with the crime, prove the identity of the deceased, shows the nature of any wounds, or throws any relevant light upon any material fact in issue." *State v. LaRette*, 648 S.W.2d 96, 103–04 (Mo.) (en banc), *cert. denied*, 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983).

■ To determine whether the knife found on the floor of John Lockheart's car was sufficiently connected to defendant Reyes or to the shooting to justify its admission into evidence, we apply the test set forth in *State v. Cuckovich*, 485 S.W.2d 16, 23 (Mo.1972) (en banc). There (at 23) the court held that, when a weapon is found in the accused's possession or the possession of his criminal associates and the circumstances justify an inference that it had been used, it is admissible to show availability of the means of committing the crime in the manner in which it occurred.

As the following cases demonstrate, Missouri courts have not approved admission of a weapon not identified as that used to commit an offense without a painstaking show of relevancy. In *Cuckovich*, the police recovered a .38 caliber revolver from the dresser in the room where the defendant was arrested some three months after fatally shooting two men. The Supreme Court concluded that the revolver was clearly connected to the defendant because the gun was in the defendant's possession at the time of his arrest and was shown by expert testimony to be similar to the murder weapon. *See also State v. Miller*, 364 Mo. 320, 261 S.W.2d 103, 106 (1953) (when the evidence gave rise to the inference that the syringe found in defendant's house, or one just like it, was used to perform an

illegal abortion, its reception in evidence did not constitute prejudicial error); *State v. Neal, supra,* 591 S.W.2d at 180–81 (the trial court properly admitted into evidence an axe and an ice pick found in defendant's house where her husband had been killed because those weapons matched, respectively, crushing incisions in the victim's skull and puncture wounds in his back); and *State v. Cross,* 699 S.W.2d 51 (Mo.App. 1985).

In *State v. Johnson,* 539 S.W.2d 493 (Mo. App.1976), *cert. denied,* 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1977), several young men "armed with various weapons including sawed-off shotguns" robbed a tavern. During the robbery, a barmaid was stabbed and a patron was shot. Two patrons were killed, one by a stab wound and the other, a police officer, by a shotgun wound to the head. *Id.* at 500. The defendant argued that various articles taken from the drawers of the dresser in the bedroom where the defendant and two others were arrested several hours after the crimes should not have been admitted into evidence. He claimed that those items—a cartridge belt, a bandolier, a pistol for firing blanks, shotgun and pistol shells, and gun cleaning equipment—were not connected with the crimes or with him, that he did not live in the house where he was arrested and no evidence established that he had ever seen the objects before or even knew of their existence.

Relying on *Cuckovich, supra,* 485 S.W. 2d at 23, the court found the articles admissible despite their inflammatory nature for the following reasons:

> Here, the items in question were found in the same house with two shotguns, a pistol and a knife, all identified as weapons used in the commission of the robbery and shooting. The articles were found in a dresser with other items about which no question was raised. The top drawer of the dresser located in the bedroom where defendant was arrested also contained the pistol of the police officer killed during the robbery. The bottom drawer also contained a knife identified by a witness as being the one carried by one of defendant's associates at the time

of the robbery. Although the exhibits in question were not identified by eyewitnesses as being used in the robbery, they show the availability to defendant of the means to commit the crime in the way that it occurred....

*Johnson,* at 516.

In *State v. Bolder, supra,* 635 S.W.2d at 688–89, the defendant argued that the trial court erred in admitting a knife allegedly used to stab the victim and a photograph of that knife because no evidence tended to prove that the knife had ever been in his possession or that it had been used to inflict the deadly wounds. Nevertheless, the Supreme Court found the knife to be sufficiently linked to the defendant and to the crime to justify admission based on the following evidence: The defendant was seen standing over the victim making stabbing motions toward his stomach. Later, the defendant was seen in the 5 A & B building wiping blood from his hands. The knife was found in a room fifteen to twenty feet from where defendant was seen entering that building. The door to that room was padlocked, but the space between the floor and the bottom of the doors was large enough for the knife to slide through. Although no fingerprints were detected on the knife when it was found, it was still wet with blood that matched the victim's blood. Furthermore, the blood on defendant's clothes matched that of the victim.

In sum, a reading of Missouri cases in point reveals that admission of a weapon not identified as that used to commit the crime requires a showing of relevancy far more substantial than that presented in this case. That is particularly so in a case such as this where the evidence of defendant's intent to cause harm is so thin. Here the evidence merely shows that the knife was found under Lockheart's front seat. At all relevant times the defendant was sitting in the back seat. No one ever saw defendant in possession of the knife or otherwise connected him with the knife. Likewise, no one ever identified the knife as in any way connected to the crime. In fact, no one other than the crime scene investigator testified about the knife at all.

Moreover, as the knife was not "similar in form and character" to the shotgun that actually killed Carlson, no inference of its having been used to commit the crime "in the manner in which it is shown to have occurred" arose to justify its admission into evidence. *Cuckovich, supra,* 485 S.W. 2d at 23.

■ Finally, in the absence of proof of a conspiracy or concerted action between the defendant and his companions, we cannot say that the presence of the knife was probative of the group's intent in going to the park or of defendant's "purpose" to cause Carlson serious physical injury. *Cf. State v. Williams,* 543 S.W.2d 563, 564–66 (Mo.App.1976) (evidence that a front seat passenger also had a concealed weapon had no logical connection with proof that defendant, who was in the back seat, carried a concealed weapon).

The state charged defendant with first degree murder, but the jury convicted him of the lesser offense of conventional second degree murder, a violation of § 565.021.1(1).[2] To sustain that conviction, the prosecution had to establish beyond a reasonable doubt that, as submitted by the court's instructions, defendant's "purpose" was to cause Carlson serious physical injury. MAI–CR3d 313.04. The specific intent to do such injury is an essential element of murder in the second degree under § 565.021.1(1), as it was under the earlier second degree murder statute, § 565.004, R.S.Mo. 1978. *State v. Mannon,* 637 S.W.2d 674, 679 (Mo.1982) (en banc). Under Missouri's Criminal Code, a

> person is not guilty of an offense unless he acts with a culpable mental state, that is, unless he acts purposely or knowingly or recklessly or with criminal negligence, as the statute defining the offense may require with respect to the conduct, the result thereof or the attendant circumstances which constitute the material elements of the crime.

§ 562.016.1. The statute further provides that a person acts "with purpose with respect to his conduct or to a result thereof when it is his conscious object to engage in

that conduct or to cause that result." § 562.016.2.

The prosecutor had little or no direct proof of defendant's "purpose" to injure Carlson—no admission, no statement or exclamation made at or before the shooting, and no eye-witness testimony as to conduct from which such a purpose could be inferred. Apparently to offset that deficiency in the evidence, to prove that defendant had a purpose to cause serious injury, the prosecutor turned to the knife to show that Lockheart and his friends went to the park "heavily armed" and "loaded for bear." By showing that they were so equipped, the prosecutor obviously intended to show that they had the "conscious object" to injure Carlson.

The difficulty with the prosecutor's theory is twofold. First, the mere presence of the unused knife under the seat did not prove that defendant knowingly conspired or acted in concert with the others to injure Carlson. *Cf. State v. Richards,* 334 Mo. 485, 67 S.W.2d 58, 60 (1933). Second, the record includes absolutely no evidence of a conspiracy or concerted action to injure Carlson and, as we shall show, evidence of the mere presence of the knife under the front seat was irrelevant in that it was not shown to be connected either to defendant or to the shooting.

■ A defendant in a criminal case who claims error in the admission of evidence has the burden of showing both error and prejudice. *State v. Hankins,* 612 S.W.2d 438, 439 (Mo.App.1981). But the Supreme Court has reminded us that, where evidence of guilt is strong, error, which in a close case would require reversal, may be disregarded. The corollary of that rule is that, where evidence of guilt is weak, error in the admission of prejudicial evidence may not be simply brushed aside. *State v. DeGraffenreid,* 477 S.W.2d 57, 65 (Mo.1972) (en banc). Error in the admission of evidence can be declared harmless only if the court can "declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S.

**2.** Unless otherwise shown, all sectional references are to Revised Statutes of Missouri, 1986.

18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *State v. Miller*, 650 S.W.2d 619, 621 (Mo.1983) (en banc). As noted by Judge Somerville in *State v. Charles*, 572 S.W.2d 193 (Mo.App.1978),[3] lethal weapons unrelated to and unconnected with the offense being tried "have a ring of prejudice seldom attached to other demonstrative evidence, and the appellate courts of this state have been quick to brand their admission into evidence, and any display of or reference to them during closing argument, as prejudicial error." *Id.* at 198, citing *State v. Holbert*, 416 S.W.2d 129 (Mo.1967); *State v. Smith*, 357 Mo. 467, 209 S.W.2d 138 (1948); *State v. Wynne*, 353 Mo. 276, 182 S.W.2d 294 (1944); and *State v. Williams, supra*. See also *Miller, supra*, 261 S.W.2d at 107.

> Judge Somerville went on to say (at 199), This court firmly subscribes to the dual proposition that error associated with the improper admission of evidence should never be declared harmless unless it can be said to be so without question, and that in order to declare so the record should demonstrate that the jury disregarded or was uninfluenced by the improper evidence.

The *Williams* case, *supra*, 543 S.W.2d at 564–66, explores the balance between relevancy and prejudice under somewhat similar circumstances. The state relied there upon *State v. Scanlan*, 308 Mo. 683, 273 S.W. 1062 (1925), arguing that evidence that a passenger in the front seat carried a weapon was admissible in defendant's trial for carrying a concealed weapon as proof of the circumstances of defendant's offense and of the circumstances surrounding his arrest. In *Scanlan*, which involved a concealed weapon charge against a front seat passenger, the arresting officer was permitted to testify that he saw three revolvers on the floor of the back seat where four other passengers were seated. The Supreme Court upheld the admission of the evidence of the guns found in the back seat and stated (at 1064),

> Of course, defendant could not be held criminally responsible for the acts of his companions, in the absence of proof of a conspiracy; but it is always proper to show the facts and circumstances surrounding and attending the alleged criminal act of a defendant on trial on the theory that such facts constitute part of the res gestae.

The *Williams* court, however, read limitations on the grounds of relevancy and unfair prejudice into the res gestae theory advanced in *Scanlan*. According to *Williams*, the fact that Nimrod in the front seat had a concealed weapon had no logical connection with proof that defendant had a concealed weapon. Moreover, in contrast with *Scanlan*, the state did not attempt to limit its proof to an incidental reference to those facts but obviously sought to exploit those facts by persistently drawing the jury's attention to the evidence of Nimrod's weapon. 543 S.W.2d at 565–66. Two officers testified to finding Nimrod's weapon along with the defendant's; Nimrod's gun was placed in evidence along with testimony that it was fully loaded when the officer discovered it; Nimrod was cross-examined about ownership of the handgun found in his possession; and, finally, its presence was referred to in the prosecutor's closing argument. Thus, the potential for unfair prejudice in admitting evidence of a weapon not connected either with the defendant or with the offense was far greater than in *Scanlan*, where the weapons in the rear seat were not placed in evidence and the testimony objected to was the single reference to their presence in the car. *Williams* at 565, also referring to *State v. Walker*, 490 S.W.2d 332 (Mo.App.1973).

Similarly, the limitations of relevancy and unfair prejudice militate against admis-

---

**3.** In *Charles*, 572 S.W.2d 193, 195–200 (Mo.App. 1978), this court granted the defendant a new trial despite the substantial evidence of his guilt of the crime charged where the prosecutor repeatedly referred to, and eventually placed in evidence, a handgun and a .38 caliber cartridge wholly unconnected to the offense being tried. The prejudicial exhibits related to defendant's arrest for carrying a concealed weapon, a charge for which he was never convicted. The prosecutor questioned the defendant and alibi witnesses about the charge and referred to the exhibits nine times during closing arguments over defendant's objections.

sion of the knife in the present case as part of the res gestae of the crime. The probative value of the evidence of the knife found in Lockheart's car, if any, was far outweighed by the unfair prejudice it created. *See Williams, supra,* 543 S.W.2d at 565. In addition to the police investigator's testimony about the presence and condition of the knife, the knife itself and two photographs demonstrating its location amid shotgun shells on the front floor of Lockheart's car were admitted in evidence. The photographs were passed to the jury. The prosecutor twice referred to the knife in his opening statement and twice again questioned witnesses about it and finally commented during closing argument that Lockheart's group went to the park "loaded for bear" with a knife and two shotguns. Moreover, the record contains no indication that the jury disregarded or was not influenced by the admission of the improper evidence. *State v. Charles, supra,* 572 S.W.2d at 199. Of course, we cannot calculate the degree of prejudice created by this inadmissible evidence. Therefore, we reverse and remand this cause for a new trial, "a small price to pay for preserving the integrity of a fair trial." *Id.* at 200.

## II.

■ In the interest of providing guidance upon retrial, we address defendant's claim that the trial court committed plain error by failing to instruct the jury on the defense of accidental homicide. Although the defendant did not request such an instruction, he argues that the notes on use following MAI–CR2d 2.28 dictate that when the evidence supports the instruction, it is to be given whether requested or not. He also contends that the court is obligated to instruct on the law of the case necessary for the jury's guidance in rendering the verdict whether requested to do so or not. Supreme Court Rule 28.02(a). *Cf. State v. Carter,* 585 S.W.2d 215, 218 (Mo.App.1979).

The record contains some evidence that the shooting was accidental. The defend-

ant testified that he picked up his shotgun and "pumped it" to scare Carlson into abandoning his attack on John Lockheart, but that instead of retreating, Carlson reached in and grabbed the barrel of the gun in an attempt to pull it away from the defendant. During the struggle, the gun discharged. Both the defendant and Billy Lichner testified that they believed the gun was unloaded because the defendant had emptied the chamber after target practice.

Contending that the law clearly requires the court to submit the accident defense to the jury when the record shows any evidence of accident or excuse "however improbable," the defendant relies on an earlier decision of this court, *State v. Cook,* 696 S.W.2d 814, 817–19 (Mo.App.1985), and its antecedents, *State v. Slaten,* 252 S.W.2d 330, 331 (Mo.1952), and *State v. Dunbar,* 360 Mo. 788, 230 S.W.2d 845, 849 (1950). He argues that under those facts failure to instruct the jury on the accident defense constitutes manifest injustice and requires reversal under the plain error rule. *See State v. Pippenger,* 708 S.W.2d 256, 269 (Mo.App.1986); *Carter, supra,* 585 S.W.2d at 218.

In view of the changes in the law resulting from the passage of § 563.070, effective on October 1, 1984, the defendant's reliance on *Cook, supra,* 696 S.W.2d at 817–19,[4] and on MAI–CR2d 2.28, withdrawn on that date, is misplaced.

According to § 563.070,

1. Conduct which would otherwise constitute a crime under chapter 565, RSMo, is excusable and not criminal when it is the result of accident in any lawful act by lawful means without knowingly causing or attempting to cause physical injury and without acting with criminal negligence.

2. The defendant shall have the burden of injecting the issue of excuse authorized under this section.

As pointed out in § 304.11, Part D, of the recently promulgated MAI–CR3d instruc-

---

**4.** *State v. Cook,* is distinguishable on several grounds. Notably, the defendant's appeal of the court's failure to submit an instruction on the accident defense was not based on plain error. Moreover, the offense took place before October 1, 1984.

tion forms,[5] "[t]his statutory definition of an excusable offense is different from the prior statutory definition of Section 559.-050, RSMo 1969, [repealed in 1979 by the 1977 Criminal Code] which codified the common law." Part D goes on to say that MAI–CR3d does not contain any instruction on this form of excuse:

No facts have been visualized where the submission of an instruction on the defense of excuse is appropriate as to any assault or homicide offense. A finding of the elements of any of those offenses is inconsistent with the defense of excuse. However, if, under unique circumstances, there is evidence of excuse not negated by the required findings of the pattern instructions for the offenses set forth in Chapter 565, the verdict directing instruction may be appropriately modified and an instruction submitting excuse prepared. See MAI–CR 3d 304.-02.

*Id; State v. Mallett*, 732 S.W.2d 527 (Mo. 1987) (en banc) at 536.

By express terms, § 563.070 places the burden of injecting the issue of excuse upon the defendant. In other words, the trial court is no longer obligated to instruct the jury on excusable homicide whether or not the defendant so requests. In the present case, the defendant did nothing to bring the accident defense into play. He did not tender a proposed instruction or make a pertinent objection, nor did he raise the issue in his motion for new trial. Because an instruction on excusable homicide is not required by § 563.070, we cannot say the trial court plainly erred in failing to submit it.

Accordingly, we reverse the conviction and remand the case for new trial.

GAITAN, J., concurs.

MANFORD, J., dissents by way of separate opinion.

MANFORD, Judge, dissenting.

I must respectfully dissent.

---

The admission of the knife in this case was not prejudicial error under the facts and circumstances of the case.

Further, on this appeal, this court is required to accept all evidence in favor of the respondent and to disregard evidence contrary to the support of the judgment. The majority opinion, I feel, has reached its decision upon the evidence introduced by appellant. This is prohibited. *State v. Franco*, 544 S.W.2d 533 (Mo. banc 1976).

---

**5.** Although MAI–CR3d generally applies to the trial of offenses committed on or after January 1, 1987, § 304.11, Part D, provides the rationale for withdrawing the former accident defense instruction, MAI–CR2d 2.28.