**STATE of Missouri, Respondent,**

**v.**

**Herbert SMULLS, Appellant.**

No. 75511.

Supreme Court of Missouri,
En Banc.

June 25, 1996.

Motion for Rehearing Overruled and
Opinion Modified on Courts Own
Motion Nov. 19, 1996.

William J. Swift, Asst. Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Attorney General, John M. Morris, Assistant Attorney General, Jefferson City, for Respondent.

Darryl J. Anderson, Bruce C. Cohen, St. Louis, for amicus curiae American Postal Workers Union AFL–CIO.

Barbara A. Frey, Executive Director, Minneapolis, MN, Richard Wilson, Washington College of Law, The American University, Washington, DC, Robert Popper, University of Missouri–Kansas City School of Law, Kansas City, for amici curiae Minnesota Advocates for Human Rights and The International Human Rights Law Clinic of Washington College of Law.

WHITE, Judge.

A jury convicted defendant of first degree murder and other crimes. Defendant was sentenced to death for the murder conviction. Defendant's Rule 29.15 motion for post-conviction relief was overruled. This Court has exclusive appellate jurisdiction. Mo. Const. art. V, § 3. The judgments entered on defendant's convictions and sentence are affirmed. The judgment entered on defendant's Rule 29.15 motion is reversed and the cause remanded for further proceedings.

## I.

This Court reviews the facts in the light most favorable to the verdict. *State v. Shurn*, 866 S.W.2d 447, 455 (Mo. banc 1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 118, 130 L.Ed.2d 64 (1994).

Stephen and Florence Honickman owned and operated a jewelry business. Typically, customers would make an appointment to examine the jewelry for sale. In early July 1991, a person identifying himself as "Jeffrey Taylor" called the Honickmans and made an appointment to buy a diamond. "Jeffrey Taylor" was later identified as defendant. On July 22, 1991, defendant and Norman Brown went to the Honickmans' store. After viewing several diamonds, defendant and Brown left the store without making a purchase.

On the afternoon of July 27, 1991, defendant and Norman Brown followed another customer into the store. Florence Honickman was unable to show them any jewelry at that time but suggested she might be able to help them later. Defendant and Brown returned to the store that evening. After viewing some diamonds, defendant and Brown went into a hallway, purportedly to discuss the diamond prices. A short time later, Florence Honickman looked up and saw defendant aiming a pistol at her. She then ran and hid behind a door. Defendant fired three shots at her, striking her arm and side. Defendant then fired several shots at Stephen Honickman, who was struck three times. Defendant and Brown stole jewelry worn by Florence Honickman and other items in the store. After the two men left the store, Florence Honickman contacted the police. Stephen Honickman died from his wounds, and Florence Honickman suffered permanent injuries from the attack.

A short time after the robbery, police stopped defendant and Brown for speeding. While defendant was standing at the rear of his car, the police officer heard a radio broadcast describing the men who robbed the Honickmans' store. Defendant and Brown fit the descriptions. The officer ordered defendant to lie on the ground. Defendant then ran from his car but was apprehended while hiding near a service road. The police found jewelry and other stolen items from the store in the car and in Brown's possession. The following morning police found a pistol on the shoulder of the road on which defendant drove prior to being stopped for speeding. Bullets test fired from the pistol matched bullets recovered from the store and Stephen Honickman.

Defendant was charged with first degree murder, first degree assault, two counts of first degree robbery and two counts of armed criminal action. The State subsequently filed an information in lieu of indictment charging defendant with the six offenses and as a prior, persistent and class X offender. The jury found defendant guilty of first degree robbery of Florence Honickman but failed to reach a verdict as to the remaining counts. Upon retrial, the jury found defendant guilty of the five remaining counts.[1] After the penalty hearing, the jury recommended the death penalty. The trial court sentenced defendant to death for the murder count and to concurrent terms of life imprisonment for each of the remaining counts.

Defendant filed a *pro se* and amended Rule 29.15 motion for post-conviction relief. The motion court denied certain claims by defendant without an evidentiary hearing and denied the remaining claims after an evidentiary hearing. Defendant then appealed to this Court. While the appeal was pending, the State filed a motion for temporary remand to the trial court for "gender *Batson*" findings. This Court sustained the State's motion and the cause was temporarily remanded to the trial court. After a hearing, the trial court found the reasons offered by the State were not pretextual.

## II.

Defendant first argues the prosecutor exercised a peremptory strike against venireperson Sidney, in violation of the prohibition in *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986).[2] The Equal Protection Clause of the United States Constitution prohibits using peremptory strikes to exclude jurors on the basis of race. *Id.* To establish a claim under *Batson*, a defendant must object to the prosecutor's use of a peremptory challenge as violating *Batson* and identify the cognizable racial group to which the stricken venireperson belongs. *Shurn*, 866 S.W.2d at 456. The State must then provide a race-neutral

explanation for the peremptory challenge. *Id.* If the prosecutor articulates an acceptable reason or reasons, a defendant must prove the proffered reason was merely pretextual and, in fact, the strike was racially motivated. *Id.*

Defendant objected to the prosecutor's challenge of venireperson Sidney as violating *Batson* and identified Ms. Sidney as African-American. The prosecutor then gave the following explanation for the challenge:

Judge, I made nine strikes. I did strike the juror Ms. Sidney who, I guess, for the record was a black female. My reasons for striking Ms. Sidney are based both upon what I observed during our voir dire and based upon my experience in trying criminal lawsuits, which has exceeded 50 cases in this courthouse including several cases before this Court in the nine years that I have been a prosecuting attorney.

My concerns with Ms. Sidney began yesterday. Ms. Sidney was very silent during all of the questioning. I observed at one point during my questioning concerning the death penalty a glare on her face as I was questioning that area. She was seated in the back row, I believe, yesterday. When I looked directly at her and asked that last row a question, she averted her eyes and wouldn't answer my question and wouldn't look at me. That made me very nervous.

The only response I was able to get out of Ms. Sidney today was when I asked her about her occupation. At first she responded with what I though[t] was a very irritated answer. She indicated that she is a mail sorter for Monsanto Company. That she sorts mail for, I believe she said, 5000 people. And her husband works for the post office. And I believe she listed him as a custodian.

It's been my experience in the nine years that I've been a prosecutor that I treat people who work as mail sorters and as mail carriers, letter carriers and people

---

1. A jury convicted Norman Brown of first degree murder, first degree assault, two counts of first degree robbery and two counts of armed criminal action. *State v. Brown*, 901 S.W.2d 260 (Mo.App.1995).

2. Unless otherwise noted, defendant's arguments address issues arising during his second trial.

who work for the U.S. Post Office with great suspicion in that they have generally—in my experience in many of the trials that I've had—are very disgruntled, unhappy people with the system and make every effort to strike back.

In my experience as a prosecutor, in trying cases where I've had several cases and left mail people on the jury, had them result in a hung jury. The most recent of which was a murder case in this courthouse last September, State versus Dana Ruff (phonetically) where a mail carrier was the holdout for a hung jury in that case.

I also have several in-laws who are employees of the postal department and even though they are somewhat relatives, I share the same opinion of them. So I treat them with great suspicion.

When she glared at me and just her general attitude, which included her outfit—which yesterday, I believe, included a beret and today was a ball cap with sequins on it, I just felt that she wouldn't be ·a good state[']s juror. Certainly, not a strong juror in the consideration of death, should we get to that part of the trial.

And also I would point out for the Court that I struck juror number eight, Ms. Dillard. I struck her for the very same reason in that she is a letter carrier and works delivering mail. And I though[t] her attitude was also confrontational. And I did not feel that her answers were ones that would give rise to me believing she would be a strong state[']s juror.

Ms. Dillard, I would point out, is a white female. And I struck her for virtually the same reasons. It's been my experience that when I left postal workers on who seem to have an attitude, based on my interpretation, that I've had bad results. And that's why I struck her.

Defendant then argued the prosecutor's reasons were pretextual and racially motivated. The trial court overruled defendant's *Batson* objection.

A reviewing court will set aside the trial court's finding regarding whether the prosecutor discriminated in the exercise of a peremptory challenge only if the finding is clearly erroneous. *State v. Weaver*, 912 S.W.2d 499, 509 (Mo. banc 1995). The trial court's finding is clearly erroneous only if the reviewing court is left with a definite and firm conviction a mistake has been made. *State v. Gray*, 887 S.W.2d 369, 385 (Mo. banc 1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1414, 131 L.Ed.2d 299 (1995). Review of the transcript reveals the prosecutor's stated reasons fall into two general categories; reasons based on general demeanor and reasons based on Ms. Sidney's occupation.

The general demeanor reasons included Ms. Sidney remaining silent for the first day of voir dire, she had a "glare on her face" during questioning regarding the death penalty, she responded to the prosecutor's question regarding her occupation with an "irritated" answer, and her general attitude including her attire. This led the prosecutor to believe she would not be a good juror for the State, particularly when considering the death penalty. Reasons such as these have been found to support a ruling that a trial court did not clearly err by finding a prosecutor did not discriminate in the exercise of peremptory challenges. *Weaver*, 912 S.W.2d at 508–10; *Gray*, 887 S.W.2d at 384; *Shurn*, 866 S.W.2d at 456; *State v. Pullen*, 843 S.W.2d 360, 363 (Mo. banc 1992), *cert. denied*, 510 U.S. 871, 114 S.Ct. 200, 126 L.Ed.2d 158 (1993).

The majority of defendant's argument focuses on the prosecutor's reasons for striking Ms. Sidney because of her occupation. Defendant contends the "postal worker" explanation was pretextual. The prosecutor stated he viewed mail sorters and postal workers "with great suspicion" because he considers them unhappy with the system and they make every effort to strike back. The prosecutor also stated he has tried many cases resulting in hung juries with "mail people" on the jury. Finally, the prosecutor asserted he had several in-laws who are postal employees and he shares the same opinion of them. A legitimate reason for exercising peremptory challenges is not one "that makes sense" but one "that does not deny equal protection." *Purkett v. Elem*, —— U.S. ——, ——, 115 S.Ct. 1769,

1771, 131 L.Ed.2d 834 (1995). Even assuming the prosecutor's reasons for challenging mail sorters and postal workers are nonsensical, this does not establish the reasons are inherently pretextual.

■ In addition, the prosecutor struck Ms. Dillard, a similarly situated white venireperson. "Crucial to the analysis is whether similarly situated white venirepersons escaped the state's challenge." *Weaver*, 912 S.W.2d at 509. The trial court did not clearly err by overruling defendant's *Batson* objection.

### III.

Appellant claims the trial court erred in refusing to require the prosecutor to provide gender neutral explanations for his peremptory strikes against women. At both trials, defense counsel objected to the prosecution's use of peremptory strikes against female venirepersons. The trial court did not require the prosecution to offer any explanation for the strikes. After the trials while this appeal was pending, the United States Supreme Court decided peremptory strikes based upon gender were impermissible. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). Subsequently, this Court sustained the State's motion for a temporary remand to the circuit court for a gender *Batson* hearing. The trial court held a gender *Batson* hearing in September, 1995. After hearing the State's explanations for peremptory strikes of each woman, the court found the reasons offered by the State to be gender neutral and not pretextual. The court, therefore, overruled defendant's gender based *Batson* objections.

Defendant raises three points on appeal from the gender *Batson* ruling. He asserts the hearing was procedurally deficient because the trial judge did not recuse and because defendant was not allowed to attend the hearing. He also attacks the ruling on the merits, claiming the prosecutor's proffered explanation for the strikes evidenced gender discrimination.

When the State filed its motion for temporary remand to hold a gender *Batson* hearing, defendant submitted suggestions in support of remand but requested the hearing be held before a different judge. This Court denied defendant's request for change of judge. Defendant then renewed the request in a motion to disqualify and filed a companion motion to have another judge hear the motion to disqualify. The trial judge refused to entertain either motion based on this Court's denial of change of judge in the remand order. Defendant argues the trial judge could not conduct a fair and impartial hearing because of his Rule 29.15 conduct, he dismissed defense counsel's gender *Batson* objections without consideration at both trials, and he had a judgment against him for gender discrimination. *See Goodwin v. The Circuit Court of St. Louis County & William M. Corrigan*, 555 F.Supp. 658 (E.D.Mo.1982), *aff'd as to Judge Corrigan and vacated as to the Circuit Court*, 729 F.2d 541 (8th Cir.), *cert. denied, Corrigan v. Goodwin*, 469 U.S. 828, 105 S.Ct. 112, 83 L.Ed.2d 55 (1984).

■ Defendant's arguments concerning the court's Rule 29.15 conduct allege racial bias, not gender bias. They do not support a claim of unfairness for gender *Batson* purposes. The refusal to require neutral, nonpretextual reasons for peremptory strikes of women at trial also fails to justify disqualification of the judge. Although the court's rulings indicate slow response to the winds of judicial change, gender *Batson* was not the law at the time of the trials. *See State v. Parker*, 836 S.W.2d 930, 941 (Mo. banc), *cert. denied*, 506 U.S. 1014, 113 S.Ct. 636, 121 L.Ed.2d 566 (1992) (Benton, J., concurring) (noting the United States Supreme Court could hear a gender *Batson* case in the next term).

■ Defendant argues a 1982 judgment against the trial judge for discriminating against a female employee on the basis of sex renders him incapable of fairly considering claims of gender discrimination during jury selection. In *Goodwin v. Circuit Court of St. Louis County*, 729 F.2d 541 (8th Cir.), *cert. denied, Corrigan v. Goodwin*, 469 U.S. 828, 105 S.Ct. 112, 83 L.Ed.2d 55 (1984), the Eighth Circuit determined there was sufficient evidence to support a jury finding of intentional or reckless indifference to plaintiff's right to be free from sex discrimination.

The action arose from a personnel decision the trial judge made in 1979. *Goodwin*, 555 F.Supp. at 661. Defendant's argument requires the assumption the judge's discriminatory conduct in an administrative capacity sixteen years earlier necessarily makes him unable to judge whether the State's reasons for striking jurors were pretextual. The assumption is overbroad if proof of actual bias were necessary to require disqualification of a judge. The test, however, is whether a reasonable person would have factual grounds to find an appearance of impropriety and doubt the impartiality of the court. *State v. Nunley*, 923 S.W.2d 911, 918 (Mo. banc 1996) (citing *State ex rel. Wesolich v. Goeke*, 794 S.W.2d 692, 698 (Mo.App.1990)). A question could arise as to whether a person who had been found guilty of sex discrimination would be able to discern gender discrimination in the State's peremptory strikes. But it appears a reasonable person would look to the passage of time since the judgment, the difference between personnel decisions and the task of judging, and decide one who had been punished for sex discrimination in the past would be more sensitive to the problem and recognize it if the State engaged in it.

On the basis of the Rule 29.15 racial bias allegations, the failure to anticipate the future gender *Batson* requirements, and the thirteen year old sex discrimination judgment, a reasonable person would not doubt the impartiality of the court in conducting a gender *Batson* hearing. Because the motion to disqualify was substantively insufficient to require disqualification and did not contain controverted facts necessitating the judge to testify, the court was not required to grant the motion for a hearing before another judge on the matter. *See State ex rel. Wesolich*, 794 S.W.2d at 699.

■ In his second point, defendant argues his constitutional right to be present during all phases of his trial was violated when the court denied his petition for writ of habeas corpus ad testificandum. A defendant has a Sixth Amendment Confrontation Clause right to be present, and a due process right to be present, "whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge...." *United States v. Gagnon*, 470 U.S. 522, 526, 105 S.Ct. 1482, 1484, 84 L.Ed.2d 486 (1985) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105–06, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934)).

■ The gender *Batson* hearing presented no witnesses to confront or evidence against defendant; therefore, defendant's Sixth Amendment right to confront witnesses was not violated. In *Gagnon*, the Court determined defendant's absence from an *in camera* conference between the judge, a juror, and defendants' attorney did not violate due process because defendants "could have done nothing had they been at the conference, nor would they have gained anything by attending." *Id.* at 527, 105 S.Ct. at 1484–85; *See also State v. McFerron*, 890 S.W.2d 764, 768 (Mo.App.1995) (applying *Gagnon* to a sidebar voir dire examination of two jurors). Looking at the record as a whole, the same analysis applies here. The gender *Batson* hearing was conducted to examine the reasons for the State's peremptory challenges of female venirepersons to determine whether they were pretexts concealing discriminatory intent. It did not require defendant's input nor did it call for any decision or reaction from defendant. Defendant had nothing to do or gain from his presence there. The court did not err by denying the request.

■ Defendant challenges the gender *Batson* hearing ruling on the merits, arguing the reasons given for the State's peremptory strikes of female venirepersons were not gender neutral. The court's determination of whether peremptory strikes were exercised on permissible grounds is a question of fact entitled to great deference on appeal. *Gray*, 887 S.W.2d at 385 (citing *Batson*, 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21); *State v. Antwine*, 743 S.W.2d 51, 66 (Mo. banc 1987), *cert. denied*, 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988). As discussed, the determination will be found clearly erroneous only if the reviewing court is left with the definite and firm conviction a mistake has been made. *Gray*, 887 S.W.2d at 385.

The State offered reasons for the peremptory strikes of each venireperson. The State used seven of its original nine peremptory strikes on female venirepersons in each trial. Defendant on appeal challenges the reasons given for five strikes in retrial and two in the first trial. The prosecutor gave the following reasons for the strikes: (1) venireperson Uhlmansiek was an employee of a defense law firm and seemed very opinionated; (2) venireperson Wahl appeared to be confused at times, was the wife of a personal injury lawyer, and the prosecutor regarded her as a "typical Ladue resident, affluent and liberal;" (3) venireperson McGregor was unemployed and had a son and daughter-in-law who were both attorneys; (4) as discussed venireperson Sidney displayed negative demeanor and was employed as a mail sorter; (5) venireperson Clover had close relatives who had been charged with criminal offenses and she was employed as a school bus driver, an occupation the prosecutor regarded as involving high stress but low skill; (6) venireperson Johns was unemployed and her son was a correctional officer; and (7) alternate venireperson Backhues was perceived as being a very weak death penalty juror.

Defendant argues these reasons were pretextual because some of the struck venirepersons gave testimony suggesting they could have been good State's jurors, venirepersons with both high and low income were struck, women employed by or related to attorneys were struck because of their legal connections even though men who had attorney friends were retained, and the inappropriate attire objected to was feminine, not masculine. After hearing the State's reasons and defendant's pretext arguments, the court determined the State's reasons were gender neutral. This Court does not find the ruling clearly erroneous. Defendant's gender *Batson* points are denied.

### IV.

Defendant also argues the trial court erred by excusing for cause venirepersons Katzenberger, Ott, Whalen, Clayton and Dickens. Defendant asserts these venirepersons all indicated they could consider the death penalty and would follow the law as submitted in the jury instructions.

A defendant's right to an impartial jury is violated when a trial court excuses venirepersons because they express objections to the death penalty. *Wainwright v. Witt*, 469 U.S. 412, 416, 105 S.Ct. 844, 848, 83 L.Ed.2d 841 (1985); *State v. Storey*, 901 S.W.2d 886, 892 (Mo. banc 1995). Prospective jurors may be excused for cause if their views on the death penalty would substantially impair their ability to follow the law. *Wainwright*, 469 U.S. at 425–26, 105 S.Ct. at 852–53; *Storey*, 901 S.W.2d at 892. Appellate courts review a trial court's ruling to a challenge for cause only for abuse of discretion. *Storey*, 901 S.W.2d at 892.

Ms. Katzenberger stated she could not envision any situation where she would impose the death penalty and she was inclined to automatically vote for life imprisonment. Mr. Ott stated he did not believe the death penalty was administered fairly, he had a moral problem with the death penalty and he would be "99 to one to vote for life imprisonment without parole." Ms. Dickens stated because of her religious beliefs she would be unable to impose the death penalty regardless of the circumstances and she did not believe in the death penalty.

Defendant emphasizes other statements by these three venirepersons that arguably indicate they would follow the law. A trial court has the opportunity to evaluate the totality of a venireperson's verbal and nonverbal responses. *State v. Isa*, 850 S.W.2d 876, 889 (Mo. banc 1993). This places the trial court in a superior position to make a determination as to a challenge for cause. *Id.* Review of the transcript does not reflect the trial court abused its discretion by excusing venirepersons Katzenberger, Ott and Dickens for cause.

Venirepersons Whalen and Clayton both indicated they would require the State to meet a higher burden than reasonable doubt because the death penalty could be imposed. A venireperson who expresses an inability to determine guilt using the appropriate burden of proof when the death penalty can be imposed may be excused for cause.

*Gray,* 887 S.W.2d at 382–83. Defendant emphasizes statements that arguably indicate these two venirepersons would apply the appropriate burden of proof. Again, the trial court is in a superior position to judge the totality of the venireperson's verbal and nonverbal responses. *Isa,* 850 S.W.2d at 889. The trial court did not abuse its discretion. *Gray,* 887 S.W.2d at 382–83.

## V.

Defendant also argues the trial court plainly erred by failing to quash the venire panel after a venireperson who had already been stricken for cause was allowed to remain on the panel and make improper comments. Defendant contends the improper comments were so prejudicial as to prevent defendant from obtaining a fair trial.

■ During voir dire, venirepersons were first questioned regarding whether jury service would be a personal hardship, and a number were excused for cause on this ground. After voir dire resumed, defendant's counsel informed the court Mr. Hirsch who had been excused for hardship was still seated with the other panel members. The court stated "[w]e'll take care of it later." Defendant's counsel did not object. The prosecutor then questioned the panel regarding their knowledge of the facts of the case. Mr. Hirsch stated "I heard of a husband and wife jewelry store owners and the husband being shot and killed. I'm not sure what happened to the wife. I haven't formed any opinions and that's all I vaguely remember." When questioned about punishment, Mr. Hirsch stated he "would find it difficult to give life imprisonment to someone who intentionally killed someone" and he would be "more pro-death than pro-life."

■ For a defendant to prevail under plain error review, manifest injustice or a miscarriage of justice must have resulted from the alleged error. Rule 30.20. To merit the quashing of an entire jury panel based on a venireperson's statement, defendant must establish the venireperson's statement was "so inflammatory and prejudicial that it can be said a right to fair trial has been infringed." *State v. Evans,* 802 S.W.2d 507, 514 (Mo. banc 1991). The trial court has broad discretion in determining whether a jury panel should be dismissed and, absent a clear abuse of discretion, its ruling should not be disturbed on appeal. *Id.*

■ Prior to Mr. Hirsch's statement regarding his knowledge of the facts of the case, the prosecutor informed the panel as to the background of the case. Mr. Hirsch's statement regarding his knowledge merely reflected the prosecutor's information to the panel and was also consistent with the evidence presented at trial. Mr. Hirsch's statements regarding punishment were simply expressions of personal opinion and other panel members also expressed their views on the issue. A defendant is not entitled to individual voir dire in death penalty cases. *State v. McMillin,* 783 S.W.2d 82, 94 (Mo. banc), *cert. denied,* 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990). Mr. Hirsch's statements did not infringe on defendant's right to a fair trial.

## VI.

Defendant contends the trial court erred by overruling defendant's objection to the State presenting and entering into evidence the two knives found in defendant's car when he was arrested. The State introduced, over defendant's objection, an envelope containing items recovered from defendant's car after his arrest. A police officer testified the envelope contained two pieces of white rope, a key, license plates, cigarette lighter, loose change and the two knives at issue. The officer described the knives as a steak knife and a folding pocket knife.

■ Review of the trial court's ruling regarding whether to admit the exhibit is limited to determining if the trial court abused its discretion. *State v. Silvey,* 894 S.W.2d 662, 669 (Mo. banc 1995). A weapon "is usually held admissible if it tends to connect the defendant with the crime, prove the identity of the deceased, shows the nature of any wounds, or throws any relevant light upon any material matter in issue." *State v. LaRette,* 648 S.W.2d 96, 103–04 (Mo. banc), *cert. denied,* 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983); *State v. Reyes,* 740 S.W.2d 257, 261 (Mo.App.1987). If a

weapon demonstrates motive, malice, intent, or knowledge or preparation, then it may be received into evidence. *State v. Evans,* 237 S.W.2d 149, 151 (Mo.1951); *Reyes,* 740 S.W.2d at 261.

██ Although there was no evidence presented demonstrating the knives were actually used during the crimes, a jury could conclude the knives constituted evidence of preparation. The two knives could have been used to cut the white rope, if the victims were tied up, or been used to open a locked desk or door. If a weapon demonstrates preparation, it may be received into evidence. *Id.*[3] Defendant's preparation for the crime was a material matter in issue, and the trial court did not abuse its discretion.

## VII.

Defendant also argues the trial court's exclusion of testimony by Terrence Parker and Michelle Shelton regarding purported statements by Norman Brown violated defendant's due process rights. Defendant contends Brown's statements were declarations against penal interest and were admissible in evidence under *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

During the first trial and before defendant called Parker or Shelton, the State objected to the anticipated testimony of the two witnesses. The trial court decided to hear the two witnesses' testimony outside the presence of the jury. Parker testified he met Norman Brown between October 1991 and January 1992 at Gumbo Correctional Center. Parker also testified Brown told him "they was in some kind of apartment" and Brown pulled the gun and fired. According to Parker, Brown also said defendant and another person were with him when the shooting occurred. Parker admitted telling a person from the prosecutor's office that Brown said defendant fired the pistol. Shelton testified she knew defendant and Brown and "three days to a week" prior to the crimes being committed she had a conversation with Brown. Brown allegedly asked Shelton whether she knew someone who wanted to buy jewelry.

The trial court held Parker and Shelton could not testify as to the statements described during the hearing outside the jury. During the second trial, defendant renewed the offers of proof for the proposed testimony of Parker and Shelton. The trial court stated its ruling on this issue would be the same as during the first trial.

Before *Chambers,* Missouri courts consistently held declarations against the penal interests of an unavailable witness were not admissible as an exception to the hearsay rule in criminal proceedings. *State v. Blankenship,* 830 S.W.2d 1, 6 (Mo. banc 1992). The rule has not been modified except to the extent required by *Chambers. Id.* at 6–7.

In *Chambers,* the defendant was on trial for the murder of a police officer and sought to introduce the testimony of three witnesses. Each witness claimed shortly after the murder that a person other than the defendant, Gable McDonald, admitted to killing the officer. *Chambers,* 410 U.S. at 291–93, 93 S.Ct. at 1043–45. Prior to attempting to call the three witnesses, McDonald was called by the defense and admitted signing a confession to the murder. During cross-examination by the State, McDonald repudiated his confession. When the defendant sought to question McDonald regarding the oral statements made to the three witnesses, the State objected to the defendant attempting to impeach his own witness. The trial court sustained the objection. *Id.* at 291, 93 S.Ct. at 1043.

The United States Supreme Court noted the statements of the three witnesses, if admitted and believed, would have exonerated the defendant and "were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability." *Id.* at 300–02, 93 S.Ct. at 1048–49; *Blankenship,* 830 S.W.2d at 7. The indicators of reliability identified by the

---

**3.** Defendant's reliance on *Reyes* is misplaced. In that case, the weapon was found under the front seat of a car in which the defendant was a passenger and there was no evidence the car's occupants were acting in concert. There also was no evidence connecting the defendant to the knife. *Reyes,* 740 S.W.2d at 262–63.

Court were: (1) each confession was "in a very real sense self-incriminatory and unquestionably against interest;" (2) each statement was spontaneously made to a close acquaintance shortly after the murder occurred; and (3) the statements were corroborated by other evidence. *Id.* at 300–01, 93 S.Ct. at 1048–49; *Blankenship*, 830 S.W.2d at 7. The Court ruled failure to admit the testimony regarding McDonald's statements, along with the failure to permit the defendant to cross-examine McDonald, denied the defendant his right to a fair trial. *Id.* at 302, 93 S.Ct. at 1049.

After *Chambers*, this Court noted "the dangers inherent in opening the door to extrajudicial confessions made by one not a party to the proceeding" and cautioned against opening the doors beyond the facts presented in *Chambers*. *State v. Turner*, 623 S.W.2d 4, 9 (Mo. banc 1981), *cert. denied*, 456 U.S. 931, 102 S.Ct. 1982, 72 L.Ed.2d 448 (1982). The reason for this caution is the uncorroborated out-of-court confession of an unavailable witness offered in a criminal case often occurs under circumstances evoking suspicion regarding its reliability. *Blankenship*, 830 S.W.2d at 7.

 The indicators of reliability found in *Chambers* are not present in this case.[4] During the offer of proof, Parker testified he met Norman Brown between October 1991 and January 1992 at Gumbo Correctional Center and the two men were both inmates "in the same area." Parker testified he did not know Brown before meeting him in jail. The fact the two men were "in the same area" does not establish the two men were close acquaintances. Parker could only remember Brown made the statements "sometime last year." The crimes were committed on July 27, 1991. At best, Brown's statements to Parker were made in October 1991, which is more than two months after the crimes occurred. There is also no other evidence corroborating the statements.

 Shelton testified Brown asked her if she knew someone who wanted to buy jewel-

ry. Defendant contends this evidence would establish defendant went to the jewelry store to coordinate the sale of Brown's jewelry to the Honickmans. However, Brown's statement is simply not "in a very real sense self-incriminatory and unquestionably against interest." *Chambers*, 410 U.S. at 301–02, 93 S.Ct. at 1048–49; *Blankenship*, 830 S.W.2d at 7–8. Shelton did not state Brown told her the jewelry he wanted to sell was stolen. The excluded testimony was not admissible based on the Court's ruling in *Chambers*. The trial court did not err by excluding Parker's and Shelton's testimony.

## VIII.

 Defendant asserts the trial court plainly erred by permitting the prosecutor to make various improper statements during closing argument for both the guilt and penalty phases. A court should rarely grant relief for assertions of plain error based on a prosecutor's statements during closing argument "because, absent an objection, the trial court's options are limited to an invited interference with summation, which increases the risk of error." *Storey*, 901 S.W.2d at 897; *See also State v. Parker*, 886 S.W.2d 908, 923–24 (Mo. banc 1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1827, 131 L.Ed.2d 748 (1995); *State v. Wise*, 879 S.W.2d 494, 516 (Mo. banc 1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 757, 130 L.Ed.2d 656 (1995). Because defendant failed to object, any error is deemed waived. *Wise*, 879 S.W.2d at 516; *McMillin*, 783 S.W.2d at 93. Gratuitous review reveals no plain error.

## IX.

Defendant also contends the trial court plainly erred by submitting Instruction 8 during the guilt phase. This instruction is based on MAI–CR3d 313.04 and provides, in part: "If you do not find the defendant guilty of murder in the first degree, you must consider whether he is guilty of murder in the second degree." Defendant argues this instruction emphasizes the greater offense, is an "acquittal first" instruction, and coerced

---

4. The State stipulated if Norman Brown was called to testify he would invoke his right against self-incrimination. Brown is, therefore, consid-

ered unavailable to testify. *Turner*, 623 S.W.2d at 9.

the jury's verdict. According to defendant, the instruction is, therefore, unconstitutional. This Court has previously rejected defendant's argument regarding this instruction. *Parker,* 886 S.W.2d at 923; *Wise,* 879 S.W.2d at 517.

■■■ Defendant also asserts the trial court plainly erred by permitting the prosecutor to argue to the jury it could not consider the second degree murder instruction unless they found defendant not guilty of first degree murder. The prosecutor told the jury it could not consider the lesser charge . "unless and until you all agree that the defendant is not guilty of murder in the first degree." The prosecutor's statement is consistent with the language in the instruction, and the trial court did not plainly err. *Parker,* 886 S.W.2d at 923–24.

## X.

Defendant also challenges the trial court's submission of the instructions defining reasonable doubt that were given during the guilt and penalty phases. Defendant argues the "firmly convinced" language of the instructions violates due process. This Court has repeatedly rejected this argument. *State v. Brown,* 902 S.W.2d 278, 287 (Mo. banc), *cert. denied,* —— U.S. ——, 116 S.Ct. 679, 133 L.Ed.2d 527 (1995).

## XI.

■■■ Defendant argues the trial court plainly erred by failing to declare a mistrial after a note from the jury indicated the jurors were concerned about their safety. While the jurors were deliberating during the guilt phase, they sent the following note to the trial court:

> We want to know the security precautions that will be taken in the court room when verdict read both times and after this is over will friends of the defendant be allowed to see the jury. Was there anyway our names or address were available to the defendant.

The trial court suggested and defendant's counsel agreed to the court sending the jury a reply that stated "[t]he court has received your note. The court at this time cannot respond to it."

Defendant first contends the note demonstrates the jury had decided punishment prior to hearing penalty phase evidence. Defendant's contention is at best speculative. The fact the note reflected the jurors' concern when the verdict was read "both times" simply does not establish the jurors had already decided punishment.

Defendant also contends the jurors' concern about their names being available to defendant evidenced they voted for death because they feared for their safety if they did not impose the death penalty. This contention is also speculative. It is just as reasonable to assume the jurors' fear for their safety was actually enhanced by their imposition of the death penalty. The trial court did not plainly err by failing to declare a mistrial after receiving the jurors' note.

Defendant also argues the trial court erred by overruling a motion to impanel a second jury to determine punishment. Defendant contends a two jury system ensures reliability in determining the appropriate punishment. Defendant also again contends the note indicates the jury had decided punishment prior to the penalty phase.

This Court has repeatedly held Missouri's statutory scheme, providing for a single jury to determine guilt and punishment in a first degree murder trial, does not violate any constitutional protections. *Wise,* 879 S.W.2d at 514. As discussed, the note does not reflect the jury had decided punishment prior to the penalty phase hearing. The trial court did not err by overruling defendant's motion for a separate jury during the penalty phase.

## XII.

Defendant argues the trial court plainly erred by permitting the State to present evidence during the penalty phase regarding defendant's prior conviction for second degree robbery. Defendant challenges the testimony describing the facts of the crime but did not object to this testimony at trial.

■■■ During the penalty phase, the jury may properly consider any act by the

defendant that demonstrates the defendant's character. *Brown,* 902 S.W.2d at 293; *State v. Chambers,* 891 S.W.2d 93, 106 (Mo. banc 1994). "In order to appropriately weigh prior convictions, the facts of those convictions may help." *State v. Whitfield,* 837 S.W.2d 503, 512 (Mo. banc 1992). However, the penalty phase should not be a "mini-trial" regarding the prior convictions. *Id.*

█ Defendant contends the evidence presented by the State constituted a "mini-trial" of his prior robbery conviction. The State presented testimony of the victim, the victim's neighbor, and a police officer. The testimony by the neighbor and police officer was very brief. Review of the limited testimony of the three witnesses does not reveal a mini-trial occurred, and defendant's argument fails.

### XIII.

Defendant argues the trial court erred by overruling motions to strike and objections to the submission of "duplicative aggravators."

Instruction 19 submitted during the penalty phase provided, in part:

In determining the punishment to be assessed against the defendant for the murder of Stephen Honickman, you must first unanimously determine whether one or more of the following aggravating circumstances exist:

1. Whether the murder of Stephen Honickman was committed while the defendant was engaged in the attempted commission of another unlawful homicide of Florence Honickman.

2. Whether the defendant murdered Stephen Honickman for the purpose of the defendant receiving money or any other thing of monetary value from Stephen Honickman.

3. Whether the murder of Stephen Honickman was committed while the defendant was engaged in the perpetration of a robbery.

4. Whether the defendant murdered Stephen Honickman for the purpose of concealing or attempting to conceal the attempted murder of Florence Honickman.

The jury found aggravating circumstances 1, 2 and 3 existed. § 565.032.2(2), (4), (11), RSMo 1986.

Defendant contends submission and the jury's reliance on the aggravating circumstances, that the murder was committed for pecuniary gain and the murder was committed during the perpetration of a robbery was improper. Defendant claims use of these two aggravators improperly permitted the jury to effectively use the same underlying facts to find the two aggravating circumstances. Defendant's argument has been rejected by this Court. *State v. Griffin,* 756 S.W.2d 475, 489 (Mo. banc 1988), *cert. denied,* 490 U.S. 1113, 109 S.Ct. 3175, 104 L.Ed.2d 1036 (1989).

### XIV.

Defendant asserts error during the penalty phase because the trial court refused to submit his non-MAI instruction, listing nonstatutory mitigating factors. This Court has previously rejected the contention that listing nonstatutory mitigating factors is constitutionally required. *Chambers,* 891 S.W.2d at 109; *Parker,* 886 S.W.2d at 929. Defendant asks this Court to reconsider the decision in *Chambers* on this issue but fails to raise a compelling argument to do so. Defendant's claim is denied.

### XV.

Defendant also argues Missouri's death penalty scheme is unconstitutional because this Court's proportionality review is inadequate, prosecutors have discretion whether to seek the death penalty, and imposition of the death penalty serves no legitimate State interest. These arguments have consistently been rejected. *Weaver,* 912 S.W.2d at 522; *Brown,* 902 S.W.2d at 291; *Chambers,* 891 S.W.2d at 113. Defendant offers no compelling reason to reconsider, and his claims are denied.

### XVI.

Pursuant to § 565.035.3, RSMo 1994, this Court must determine: (1) whether the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether the jury's finding of

**24**

statutory aggravating circumstances is supported by the evidence; and (3) whether the sentence is excessive or disproportionate to similar cases.

There is no evidence defendant's sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.

■ As previously discussed, the jury found the following statutory aggravating circumstances: the murder of Stephen Honickman was committed while defendant was engaged in the attempted unlawful homicide of Florence Honickman; the defendant murdered Stephen Honickman for the purpose of defendant receiving money or any other thing of monetary value from Stephen Honickman; and, the murder of Stephen Honickman was committed while defendant was engaged in the perpetration of a robbery. § 565.032.2(2), (4), (11), RSMo 1986. The evidence supported the jury's finding of these three statutory aggravating circumstances.

■ "If the case, taken as a whole is plainly lacking in circumstances consistent with those in similar cases where the death penalty has been imposed, then a resentencing will be ordered." *Gray*, 887 S.W.2d at 389. The Court has compared similar cases where: (1) the murder was committed while the defendant was engaged in the attempted murder of a person other than the murder victim; (2) the defendant murdered the victim for pecuniary gain; or (3) the murder was committed while the defendant was committing a robbery. *Gray*, 887 S.W.2d at 369; *Wise*, 879 S.W.2d at 494; *State v. Hunter*, 840 S.W.2d 850 (Mo. banc 1992), *cert. denied*, 509 U.S. 926, 113 S.Ct. 3047, 125 L.Ed.2d 732 (1993); *State v. Ervin*, 835 S.W.2d 905 (Mo. banc 1992), *cert. denied*, 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993); *State v. White*, 813 S.W.2d 862 (Mo. banc 1991), *cert. denied*, 502 U.S. 1103, 112 S.Ct. 1193, 117 L.Ed.2d 434 (1992); *State v. Kilgore*, 771 S.W.2d 57 (Mo. banc), *cert. denied*, 493 U.S. 874, 110 S.Ct. 211, 107 L.Ed.2d 164 (1989); *Griffin*, 756 S.W.2d at 475; *State v. Young*, 701 S.W.2d 429 (Mo. banc 1985), *cert. denied*, 476 U.S. 1109, 106 S.Ct. 1959, 90 L.Ed.2d 367 (1986). Considering the crime, the evidence and defendant, the penalty imposed is not excessive or disproportionate to the penalties imposed in similar cases.

### XVII.

Defendant argues the trial judge erred by overruling defendant's original and supplemental motions to disqualify the judge from deciding defendant's Rule 29.15 motion. In addition to seeking disqualification of the trial judge, defendant sought to have a different judge hear the motion to disqualify and sought to have a judge hear the motion who never served on the Twenty–First Judicial Circuit or who was not acquainted with the trial judge.[5]

■ Defendant first contends the motion to disqualify should have been sustained because the trial judge could not fairly consider claims involving racial issues that were raised in defendant's Rule 29.15 motion. As discussed in part III, the test for a disqualifying bias is whether a reasonable person would have a factual basis to find an appearance of impropriety and doubt the impartiality of the court.

Among the more than one hundred pages of defendant's Rule 29.15 motion is a claim his trial counsel rendered ineffective assistance by failing to investigate and move to disqualify the trial judge on account of racial bias. The specific issue we consider is whether the trial judge erred in refusing to sustain the motion to recuse in the Rule 29.15 hearing. That verified motion contended that the trial judge ought to have recused on account of racial bias, and because he would be a witness on that issue. *State v. Harris*, 842 S.W.2d 953, 956–57 (Mo.App. 1992) (holding that the judge who presided at trial should not rule on post-conviction claims as to which the judge will be called as a witness).

---

**5.** Defendant's request that all judges from the Twenty–First Judicial Circuit and those acquainted with the trial judge be disqualified is, for purposes of this appeal, premature. Because circumstances affecting whether recusal is necessary may vary for different judges within a circuit, a particular judge is, in the first instance, in the best position to determine if recusal is necessary. *State v. Nunley*, 923 S.W.2d 911, 917–18 (Mo. banc 1996).

Defendant's counsel filed a verified motion to disqualify the trial judge for cause. Among other things, the motion claimed that defendant would offer: (1) expert testimony that Judge Corrigan treated African–American litigants differently than caucasians in other cases in which he sat as the trial judge; (2) the testimony of another member of the judiciary that newspaper accounts of a racially derogatory statement made in 1983 by Judge Corrigan were accurate; (3) evidence that defendant's counsel filed a motion seeking a court reporter to report in-chambers proceedings, and that Judge Corrigan had overruled the motion, saying that "he didn't give a shit that [defendant's counsel] had brought [his] own court reporter," and that he subsequently made statements indicating bias in the absence of the court reporter. In addition, defendant's appellate counsel reminds the Court of a federal verdict of sexual harassment against the trial judge in which several sexist remarks were attributed to him, including "'This Court won't run smoothly until we get rid of these g— d— women.'" *Goodwin v. Circuit Court of St. Louis County*, 729 F.2d 541, 544 (8th Cir. 1984). Defendant further alleged in his motion that Judge Corrigan would likely be called to testify regarding these contentions. Those factual allegations, while not conclusive of defendant's claim of bias, are made compelling by the record of the trial.

▋ According to the record, defendant's counsel sought a mistrial the morning following the trial court's decision to overrule defendant's claim that the selection process that led to the all-white jury violated *Batson*. In overruling the motion, the trial judge offered the following comments:

MS. KRAFT [Defendant's Counsel]: Judge, I believe I stated on the record yesterday when I made my record that Ms. Sidney was the only black juror remaining out of the 30.

THE COURT: You made that statement.

MS. KRAFT: Okay.

THE COURT: You see, I have a problem. I don't know what it is to be black. I don't know what constitutes black. And I never, in this Court, no matter what any

appellate court may say, I never take judicial notice that anybody is black or that only one person or four persons or eight persons are black.

That to me is something that I don't think this Court is wise enough or any other appellate court is wise enough unless there is direct evidence as to who is black and who is white and who is orange and who is purple. I do not under any circumstances in this division ever take judicial notice of the number of people who are black. And I believe that's counsel's responsibility to prove who is black and who isn't or who is a minority and who isn't.

There were some dark complexioned people on this jury. I don't know if that makes them black or white. As I said, I don't know what constitutes black. Years ago they used to say one drop of blood constitutes black. I don't know what black means. Can somebody enlighten me of what black is? I don't know; I think of them as people.

I listened to the responses of Ms. Sidney. I watched her attitude very briefly as it may have been, and I'm not going to sit here and say to you that Ms. Sidney is not black. But I'm not going to make a judgment as to whether anybody else on the panel was, so in any event, I'm merely telling you that for the record. I'd rather not even discuss it on the record.

But, in any event, I'm going to deny your motion for a mistrial on the basis stated. Are we ready to proceed?

This Court has recognized the benefits of having the judge who presided at trial rule on post-conviction claims. *Thomas v. State*, 808 S.W.2d 364, 367 (Mo. banc 1991). Nevertheless, there are occasions when fundamental fairness requires the trial judge to recuse in a post-conviction proceeding. *Jackson v. State* 585 S.W.2d 495, 497 (Mo. banc 1979). This is because fundamental fairness requires that the trial judge be free of the appearance of prejudice against the defendant as an individual and against the racial group of which the defendant is a member.

We restate our focus: the issue we address here is neither the propriety of the trial

judge's ruling on the *Batson* issue, nor whether the trial itself was tainted. The relevant issue is whether this trial judge should have sustained a motion to recuse on defendant's Rule 29.15 motion. The standard by which we determine the question is not whether the trial judge is actually prejudiced. Instead, the standard is whether there is an objective basis upon which a reasonable person could base a doubt about the racial impartiality of the trial court.

*Batson* is a race-centered standard. The threshold question is the race of the challenged venireperson. Specifically, the first step to be followed when the defendant makes a timely *Batson* objection is "the defendant must raise a *Batson* challenge with regard to one or more specific venirepersons struck by the state and identify the cognizable racial group to which the venireperson or persons belongs." *State v. Parker*, 836 S.W.2d 930, 939 (Mo. banc 1992). The trial court cannot add subtle burdens to the *Batson* process by refusing to take note of race where trial counsel properly places it at issue.

■ Courts must be vigilant in enforcing the laws of this state and nation that prohibit overt acts of racial prejudice by public servants. Those laws have not eradicated prejudice. Rather, they have forced prejudiced persons to disguise their bias by hiding behind neutral-sounding language. Therefore, we may not simply accept ostensibly neutral language as showing an absence of prejudice. Statements must be considered in the context in which they are offered.

Here, the trial judge made his remarks in the context of a *Batson* challenge. *Batson* is not race-neutral. It requires the trial judge to focus his or her attention solely on race. Race-neutral language has but one purpose in a *Batson* setting—to deny the effectiveness of the race-focused *Batson* inquiry.

The trial judge's gratuitous statements raise serious questions about his willingness to do what *Batson* requires. His words suggest an inability or hostility to taking notice of a venireperson's race, no matter how obvious it is.[6]

■ A judge should recuse where "the judge's impartiality might reasonably be questioned . . . ." Rule 2, Canon 3D. This rule expresses the obvious truth that, in our courthouses, judges set the tone. Judges control the participants. Judges define the boundaries of appropriate and inappropriate conduct. And judges make the decisions as to the rights and responsibilities of the participants in the course of litigation.

■ Because judges control the courtroom, judicial behavior must be beyond reproach. Conduct of judges during trial that raises questions of racial bias, even when the conduct may seem relatively minor in its manifestation undermines the credibility of the judicial system and opens the integrity of the judicial system to question.

[O]ur system of law has always endeavored to prevent even the probability of unfairness . . . . Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way justice must satisfy the appearance of justice.

*In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955)

■ The judge's gratuitous remarks manifest a lack of understanding of the import of the issues underlying *Batson,* and of what the codewords "one drop of blood" mean to many participants in the judicial system.[7] It is not the judge to whom we

---

6. Both defense counsel and the prosecution had stated on the record that the challenged venireperson, Ms. Sidney, was black.

7. "One drop of blood" is an offensive phrase because it is reminiscent of the manner in which slaveholders sought to increase the supply of slaves, and by which laws denied many legal protections to mixed-race citizens. *See, e.g.,* An

Act Concerning Free Negroes and Mulattoes, § 1, RSMo 1835, 413–14:

Every person, other than a negro, of whose grandfathers or grandmothers any one is or shall have been a negro, although all his or her other progenitors, except those descending from the negro, shall have been white persons, who shall have one fourth or more negro blood, shall be deemed a mulatto.

should afford the benefit of the doubt. The rights and due-process based expectations of the parties are the Court's proper focus.

 The reasonable-person, objective standard we employ is not hypersensitive. It merely acknowledges the fact that prejudice is most often subtle, sometimes masquerading in superficially neutral language. No one would dispute that a judge should never use words or terms that suggest racism. Where there is ambiguity, the Court's obligation is to construe language in favor of assuring the appearance of fairness to the litigants because "justice must satisfy the appearance of justice." *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 825, 106 S.Ct. 1580, 1587, 89 L.Ed.2d 823 (1986).

When the judge's on-the-record comments are coupled with his status as a potential witness to off-the-record issues raised in the post-conviction forum, fundamental fairness and the code of judicial conduct demand that he sustain the motion to disqualify himself. We hold that the trial judge erred in overruling defendant's motions to disqualify himself from the Rule 29.15 hearing. Therefore the trial court's judgment on the Rule 29.15 motion must be reversed, and the cause remanded for a new hearing before a new judge.

## CONCLUSION

The judgments entered for defendant's convictions and sentence are affirmed. The judgment entered for defendant's Rule 29.15 motion is reversed and the cause remanded for consideration of all issues raised in that motion.

HOLSTEIN, C.J., and BENTON, ROBERTSON and COVINGTON, JJ., concur.

LIMBAUGH, J., concurs in part and dissents in part in separate opinion filed.

PRICE, J., concurs in opinion of LIMBAUGH, J.

And, Mo. Const. Art. III, § 26 (1820):
 It shall be [the General Assembly's] duty, as soon as may be, to pass such laws as may be necessary,

LIMBAUGH, Judge, concurring in part and dissenting in part.

I concur in the affirmance of the conviction, but I dissent in the reversal of the Rule 29.15 proceeding.

Racial prejudice is the scourge of our society, and in my mind, there is no more damning criticism than to be called a bigot. To every extent possible, our trial judges must conduct themselves so that there can be no basis upon which a reasonable person could harbor doubt about a judge's racial impartiality. That said, neither neutral language, inoffensive to objective observers, nor isolated events remote in time or circumstance, should require the disqualification of a trial judge.

According to Part XVII of the majority opinion, recusal is required "when the [trial] judge's on-the-record comments are coupled with his status as a potential witness to off-the-record issues." In my view, not only are the "on-the-record comments" grossly mischaracterized, but the "off-the-record issues" do not confer "potential witness" status upon the trial judge because they are not actionable as a matter of law.

### I.

The majority begins by reviewing the laundry list of the trial judge's past sins as alleged in defendant's motion to disqualify. Those allegations, as the majority acknowledges, are "not conclusive of defendant's claim of bias," and under close scrutiny, the allegations should have no bearing at all. Evidence that the judge swore at defense counsel over a controversy about counsel's request to bring a private court reporter to record in-chambers proceedings is intemperate and unbecoming, but it has nothing to do with racial prejudice, and neither the majority nor defense counsel purport to show otherwise. Similarly, the majority offers no explanation how a 16–year–old verdict of sexual harassment against the trial judge is indica-

*First.* To prevent free negroes and mulattoes from coming to, and settling in this state, under any pretext whatsoever....

tive of discrimination on the basis of race. Indeed, under Part III of its opinion, the majority persuasively explains why the 16–year–old verdict does not disqualify the judge from deciding gender discrimination claims in the gender-*Batson* hearing that he conducted in this very same case! If the evidence of the sexual harassment verdict does not disqualify him from hearing claims of sexual discrimination, how possibly does it disqualify him from hearing claims of racial discrimination?

The allegation concerning a racial slur made in the company of just a few people at a private social event back in 1983 fares no better. Even if the allegation is true (in fact, it is hotly contested), no reasonable person would find an appearance of impropriety in the fact that the judge presided over race-*Batson* hearings years later. As the majority aptly noted in its Part III discussion about the gender-*Batson* hearing, a reasonable person would consider the passage of time and the difference between matters outside the courtroom and the task of judging.

The final allegation—the disparate treatment of whites and blacks—is even more baseless than the others. The outline of the "expert testimony" set out in the affidavit filed in support of defendant's motion to disqualify, identifies six cases in which Judge Corrigan supposedly treated blacks differently than similarly-situated whites in three other cases. Under defendant's theory, these cases establish a pattern and course of conduct that prove conclusively that the trial judge is hopelessly bigoted and unworthy of his office.

To the contrary, six cases from this judge's 20–year–plus judicial career—a career in which he has presided over scores of trials and has taken hundreds of guilty pleas—are hardly proof of a pattern of racial bias. Moreover, to fully discredit this theory, one need only examine the substance of the alleged disparate treatment. Defendant does not contend that sentences were meted out unevenly or that rulings were one-sided. By far the worst claim is that the judge referred to the defendants in derogatory terms, and even that happened only in four of the cases. In one case, the judge called the defendant

an animal; in another, a coward; in another, a manipulator; and in another, a clown. In the first case, the defendant had beaten, bloodied and raped an elderly woman. Given those circumstances, the judge's characterization was appropriate, maybe even understated. The other three cases are comparable. In short, this kind of claim is nonsense.

## II.

The majority's criticism of the trial judge's on-the-record comments stems from an illogical and overzealous attack on the judge's use of race-neutral language. Although their analysis begins with the tacit concession that the trial judge's language was indeed race-neutral, they conclude that the same language, when viewed "in context," somehow becomes offensive, if not scandalous. I am puzzled by the majority's statement that race-neutral language is inappropriate in the *Batson* setting; at the least, that statement is counterintuitive. What I do understand about the majority's position, however, is their belief that prejudiced persons "disguise their bias by hiding behind neutral-sounding language," and that "we may not simply accept ostensibly neutral language as showing an absence of prejudice." While I don't necessarily disagree with that proposition, a person using race-neutral language, which by definition is innocuous on its face, should be entitled to a presumption that he or she is not biased. I perceive great risk in any standard that mandates an inquiry to determine whether the words used mean something different than what they say, as if all speech is suspect. Under this kind of subjective review, even the most saintly of us may be the target of overzealous scrutiny and quite often, false claims. The majority's pronouncement that "[i]t is not the judge to whom we should affirm the benefit of the doubt" is a misstatement of the law. Instead, the analysis should begin with recognition of the well-established tenet that the honesty and integrity of judicial officers is presumed. *Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975).

The focus of the majority's wrath was first, the judge's indication that he would not take

judicial notice of the race of the jurors, and second, the judge's remark that "one drop of blood constitutes black." On each of these matters, the majority purports to evaluate the comments in context, but in fact takes the comments out of context. At the time the comments were made, the day after voir dire when none of the prospective jurors were present, defense counsel was attempting to make a record with the court that Ms. Sidney was the only black juror remaining out of the 30 persons on the panel. In response to the request, the judge agreed that Ms. Sidney was black, but he refused to take judicial notice of the final makeup of the jury, and he required "direct evidence as to who is black and who is white." His statement that it is "counsel's responsibility to prove who is black and who isn't" comports with the threshold requirement for any *Batson* challenge that defense counsel identify the cognizable racial group to which the veni-reperson in question belongs. *State v. Parker*, 836 S.W.2d 930, 939 (Mo. banc 1992), *cert. denied*, 506 U.S. 1014, 113 S.Ct. 636, 121 L.Ed.2d 566 (1992). In many circuits, that identification can be established from answers on jury information sheets filled out and sworn to by each prospective juror. Furthermore, except for the rare case in which there is a dispute about the race of a particular juror, it is customary for the prosecutor to stipulate to the identification. Without information sheets or a stipulation, it is incumbent on defense counsel who wish to press a *Batson* claim to make a proper record of the racial makeup of the jury. Although the majority finds it offensive that the trial judge was unwilling to take judicial notice of a person's race, it is equally offensive for the judge to presume what race another person ought to claim.

The fact that it is sometimes difficult to ascertain a person's race is a bona fide concern for all trial judges. I have found no case from any jurisdiction, state or federal, that states, or even proposes, any criteria for determining a person's race in order to afford proper consideration under *Batson*. In his comments, taken as a whole, the judge does nothing more than convey his difficulty in ascertaining which members of the jury are black.

In that regard, the trial judge's remark that "one drop of blood constitutes black" is simply his observation that years ago the phrase was used to categorize persons as blacks who were of mixed/black race to whatever degree. Although the phrase was used by those who would identify blacks in order to deprive them of the same status as whites or, at the very least, to invoke a racial slur, the evidence in this case is insufficient to show that the trial judge used the phrase in that fashion or for that purpose. In context, the phrase does not constitute a racial slur. Indeed, after making that statement, the judge emphasized his intent to be colorblind and unbiased by then stating, "Can somebody enlighten me of what black is? I don't know; I think of them as people."

Perhaps the most telling indictment of the majority's conclusion is that no objection was made at trial by defendant's counsel. The likely reason for making no objection, had the majority shown any deference to either trial counsel or the judge, was that the remarks were made innocuously. The reasonable inference from trial counsel's failure to object is that the judge's remarks were made without a smirk on his face or a derogatory tone in his voice or any other conduct that would support a claim of bias from the use of race-neutral words.

Arguably, the fact that "one drop of blood" was used historically to disparage blacks makes its use in any context insensitive. A mere incident of insensitivity, however, which by all appearances was unwitting, does not rise to the level of "words or conduct [that] manifest bias or prejudice ... based upon race" under Rule 2, Canon 3(C), or "personal bias or prejudice concerning the proceeding" under Rule 2, Canon 3(D). In my view, when the remark is considered in context, there is not even an appearance of impropriety.

### III.

To conclude, I am unwilling to convict a person of racial prejudice on evidence as scanty as this. In these times of racial sensitivity, the zeal with which we should rightful-

ly root out prejudice should not turn into a witch hunt.

Accordingly, I dissent in the reversal of the Rule 29.15 proceeding.